## STATE OF CONNECTICUT *v.* ALBERTO AMPERO
(AC 33545)

Bear, Sheldon and Pellegrino, Js.

---

Argued April 17—officially released August 6, 2013

*Naomi T. Fetterman*, with whom, on the brief, was *Aaron J. Romano*, for the appellant (defendant).

*Nancy L. Chupak*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Robin D. Krawczyk*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Alberto Ampero, appeals from the judgment of conviction, rendered after a jury trial, of kidnapping in the second degree in violation of General Statutes § 53a-94 (a) and interfering with an officer in violation of General Statutes § 53a-167a.[1] On appeal, the defendant makes three claims:

---

[1] The jury found the defendant not guilty of the charges of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A) and strangulation in the second degree in violation of General Statutes § 53a-64bb.

(1) that the admission of testimony regarding his prior bad acts constituted reversible error; (2) that the admission of testimony regarding his prior incarceration constituted reversible error; and (3) that prosecutorial impropriety in offering the foregoing evidence and arguing its significance to the jury deprived him of a fair trial. We disagree, and thus affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On August 27, 2009, around 7 p.m., the victim, Jasmin Vazquez, was driving her three children, a six year old, a four year old, and a six month old, to her mother's house on Natick Street in Hartford, when she stopped at the store on the corner of Broad and Ward Streets in Hartford to buy them chips and juice. She had parked her car on Broad Street and was walking around the car to remove her children from it when she saw the defendant. The victim and the defendant previously had been in a relationship together that ended in April, 2009, following an incident in which the defendant slapped the victim in the face and broke both of her cell phones in half.

The defendant initiated a conversation with the victim by saying that they needed to talk, to which the victim replied that they did not have to talk about anything. After the defendant repeated that they needed to talk, he showed the victim a kitchen knife in his back pocket and told her to get into her car. After the victim complied, the defendant also got into the car and told the victim to drive around the corner and park in front of an apartment building on Ward Street. Once she had parked her car around the corner, the defendant turned off the car's motor and told the victim and the two older children to get out of the car. The defendant also got out of the car and carried with him the victim's six month old son in his car seat. The defendant then directed the victim and the children into his apartment.

The defendant led the victim and her children upstairs to a room inside of the apartment that contained only a bed, told the two older children to go to sleep, and put the baby, who was still in his car seat, on the floor.

The defendant, who was then "real mad," again told the victim that they had to talk. The victim repeatedly told the defendant that she wanted to go home, but the defendant told her she was not going anywhere. The defendant argued with the victim and would not let her leave the apartment or make any phone calls. At some point during the argument, the defendant pressed the same knife that he previously had displayed to the victim against her stomach and told her that he loved her and that if she was not going to be with him, she would not be with any man. The defendant also threatened that if the victim was not going to be with him, he would either kill her or kill himself and that she would have to live with the fact that he had killed himself for her love.

The defendant argued with the victim for the next several hours and at one point bit her neck, leaving hickeys to show that she belonged to him. The defendant held the victim overnight. The next day, the victim tried to escape by bringing her children downstairs, but the defendant would not let her leave. The defendant grabbed the victim by her right wrist, told her she was not going anywhere, took her phone, and ordered her to call her mother. The defendant instructed the victim to tell her mother that she was happy with the defendant, that she loved him and that they were going to be together. The victim complied, but the victim's mother did not believe her daughter because she was crying and she knew her daughter was afraid of the defendant. The victim's mother repeatedly asked her about her location, what the defendant was doing to her, and if the children were okay. The victim was able to respond only that the children were okay. The defendant then took the phone and spoke with the

victim's mother directly, telling her that he knew she had called the police in April when he was arrested and that she had better not call the police this time.[2] The victim's mother then handed the phone to her husband so that she could call the police. Fearing that the defendant would hear her calling the police, the victim's mother told the 911 operator that she had had a fight with her daughter that had caused her daughter to leave the house and that she was requesting a well-being check. The defendant then hung up the phone.

After the phone conversation with her mother, the victim repeatedly told the defendant that she wanted to go home, to which he replied that she was not going anywhere. The defendant then grabbed the victim by her neck, choking her and leaving scratch marks on her neck. The victim attempted to go downstairs with her children, but the defendant grabbed her by the neck again. The defendant then let the victim go downstairs with her two older children, but he brought the baby back upstairs, and the victim yelled at the defendant to give her back her baby. At this point, an unidentified older man who lived downstairs told the defendant to give the victim back her baby and to let her go because he did not want any trouble with the police. The defendant obliged and let the victim and her children leave the apartment. He made the victim promise to come back, however, and threatened that if she did not return, he would look for her and kill her. The victim then drove to her mother's house, where she was met by Officers Robert Quaglini and Robert Iovanna of the Hartford Police Department, who had responded to her mother's 911 call. The victim informed the officers of

---

[2] Following the April, 2009 incident that ended their relationship, the victim encountered the defendant twice more: the defendant followed the victim from her friend's house to her mother's house and also threatened her over the phone with a gun that he claimed to have, which was later discovered to be a facsimile. The victim's mother called the police when the defendant was following the victim, and he subsequently was arrested.

what had happened and provided a description of the defendant and the location where the incident had occurred.

Quaglini and Iovanna then left the mother's home in pursuit of the defendant. After obtaining the defendant's name, date of birth, and "DOC picture"[3] from their cruiser computer, they began walking on Ward Street and saw the defendant standing on the front steps of an apartment building. When Quaglini made eye contact with him, the defendant immediately turned around and ran inside the apartment. Quaglini ordered the defendant to stop, but he did not comply. Quaglini then chased him into the apartment, where he ran down the back stairs and out the back door of the apartment. The defendant ran west on Ward Street, turned north on Lawrence Street, passed a couple of houses, ran east, and started hopping fences in the backyards while running northbound on Lawrence Street.

Quaglini saw the defendant hop a fence at 913 Broad Street and later located him hiding under a minivan parked near that address. Quaglini first ordered the defendant to come out from under the minivan, but he refused. When Quaglini attempted to grab the defendant's feet to pull him out, the defendant began kicking at Quaglini's hands. Quaglini then struck the defendant's ankle with his baton, but the defendant still would not come out. Quaglini struck the defendant's ankle three more times before he was able to grab

---

[3] Quaglini was not asked either on direct or on cross-examination for an explanation of the acronym DOC. In their briefs in the present appeal, counsel for both parties addressed the issue of whether the jury understood the meaning of the acronym DOC, as well as whether they could infer that such a photograph is taken when an individual has been incarcerated. From Quaglini's testimony, a reasonable jury could have inferred that DOC is an acronym for the Department of Correction, but based on this information alone, it likely could not reasonably have inferred that such a photograph was a result of the defendant's previous incarceration, without additional testimony of Quaglini.

the defendant's feet, pull him out, and place him in handcuffs. The defendant was given medical treatment at the scene for swelling to his ankle, and later was treated at Hartford Hospital for a broken ankle. After the defendant was placed under arrest, he stated that he "didn't do it," that he just wanted to be with the victim, and that they had had an argument about their relationship. The police then transported the victim to the scene for a showup identification of the defendant and to the Hartford Police Department to have her statement taken by the major crimes detectives.

Following a jury trial, the defendant was found guilty of kidnapping in the second degree and interfering with an officer. On the charge of kidnapping in the second degree, the court sentenced the defendant to twenty years of incarceration, suspended after ten years, followed by five years of probation. On the charge of interfering with an officer, the court sentenced the defendant to one year of incarceration, to be served concurrently with his sentence for kidnapping in the second degree. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant's first claim on appeal is that the admission of evidence of his prior bad acts constituted reversible error. We disagree.

The following additional facts are relevant to our resolution of this claim. The defendant references five instances in which three of the state's witnesses testified about his prior bad acts. First, the victim testified that when she and the defendant broke up in April, 2009, the defendant broke both of her cell phones in half and slapped her in the face. The victim also testified about another incident involving the defendant where he threatened her over the phone with a gun and then followed her in his car, which resulted in his arrest.

The victim further testified that a condition of the defendant's probation was a court order that he have no contact with her. The victim's mother testified that she previously had called the police on the defendant, that he had been arrested as a result of that call, and that he had been incarcerated in the past. Finally, Officer John Zweibelson testified that he previously had arrested the defendant for the incident involving the alleged gun, which later turned out to be a facsimile.

The record reflects that at no time did defense counsel object to or seek to strike any of the prior bad acts testimony, nor did he request a limiting instruction as to the jury's permissible use of such testimony. Because the defendant did not raise this issue at trial, he now seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), or alternatively, under the plain error doctrine. Practice Book § 60-5. In *Golding*, our Supreme Court held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 239–40. We conclude that the record is adequate for review and turn our attention to the second prong of *Golding*, namely, whether the defendant's claim is of constitutional magnitude alleging a violation of a fundamental right.

We have consistently held that purely evidentiary claims fail to satisfy the second prong of *Golding*, as

they are not of constitutional magnitude. See, e.g., *State* v. *Stepney*, 94 Conn. App. 72, 79, 891 A.2d 67 ("[t]he defendant can not raise a constitutional claim by attaching a constitutional label to a purely evidentiary claim or by asserting merely that a strained connection exists between the evidentiary claim and a fundamental constitutional right"), cert. denied, 278 Conn. 911, 899 A.2d 40 (2006). Here, the defendant's claim is a classic evidentiary claim, in that it challenges the admission of evidence, namely, evidence of the defendant's prior misconduct. It is well settled that issues concerning the admission of, and judicial instructions on, prior misconduct evidence are solely evidentiary in nature and that the court's failure to give a limiting instruction is not a matter of constitutional magnitude. See, e.g., *State* v. *Dews*, 87 Conn. App. 63, 75, 864 A.2d 59, cert. denied, 274 Conn. 901, 876 A.2d 13 (2005). Because the admission of evidence of the defendant's prior bad acts is not of constitutional magnitude, his claim fails to satisfy the second prong of *Golding*.

The defendant alternatively seeks review of this claim under the plain error doctrine. Practice Book § 60-5. "[T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . [It] is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly." (Internal quotation marks omitted.) *Crawford* v. *Commissioner of Correction*, 294 Conn. 165, 204–205, 982 A.2d 620 (2009). The defendant's claim is not such a "truly extraordinary [situation]." Id.

Here, it clearly appears that defense counsel strategically chose not to object to the admission of the prior bad acts testimony, as he questioned the state's witnesses about such evidence and incorporated their testimony into his closing argument. He thus treated the evidence as helpful to the defendant's defense rather than erroneous and prejudicial, much less violative of the defendant's fundamental right to a fair trial. "[A] party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice . . . ." (Internal quotation marks omitted.) Id., 205. The defendant cannot show manifest injustice because his defense counsel waived this claim by failing to take action against the admission of such evidence and then strategically used the evidence to his advantage. See *Mozell* v. *Commissioner of Correction*, 291 Conn. 62, 70–71, 967 A.2d 41 (2009).

Specifically, defense counsel cross-examined three of the state's witnesses about their testimony regarding the defendant's prior bad acts and incarceration. In fact, when cross-examining the victim, who was the state's first witness, defense counsel began his examination with those very subjects, as follows:

"Q. Hi, Ms. Vazquez.

"A. Hi.

"Q. You told the jury about two incidents in April of 2009, and I'd like to go over those first with you. Okay?

"A. Yes.

"Q. The first incident involved you picking up [the defendant] someplace on Ward Street. Is that correct?

"A. Yes.

"Q. And he was mad at you because you weren't there on time? Is that what you told the police?

"A. Because I didn't answer the phones on time.

"Q. Okay. And—so what you told the police is because of that, he broke your cell phones. You have two cell phones?

"A. Yes.

"Q. He broke both of your cell phones, and he slapped you.

"A. Yes. . . .

"Q. Now, the next incident was, what, about a week later?

"A. Yes.

"Q. And you told the police [that the defendant] was following you around in a car?

"A. Yes.

"Q. And threatening you with a handgun?

"A. Yes.

"Q. And you told the police he'd done that a number of times in the past, didn't you?

"A. Yes.

"Q. And you actually told the police about the week before, and did you tell them that involved a handgun, too?

"A. No.

"Q. Are you sure?

"A. Yes.

"Q. Now, the police did stop [the defendant] outside your mom's house. Right?

"A. Of the block, not in front of my mom's house, like a block away.

"Q. Pretty close to your house, though. Right?

"A. Yes. . . .

"Q. Now, I—you had said at some point that in describing the way [the defendant] was acting that he was really mad or at—at points he was really mad?

"A. Yes.

"Q. And you'd never seen him that way before?

"A. No.

"Q. Not even when he broke your cell phone?

"A. No. It was—it was different. I—I can't explain it. It was just different. . . .

"Q. Did you have an order of protection from the first set of instance? Was—was there some piece of paper that you had said that [the defendant] wasn't supposed to have contact with you?

"A. The paper that they had sent from the court.

"Q. Okay. You had something like that?

"A. Yes.

"Q. Okay. Did the police ask you about that in August?

"A. Yes, they did.

"Q. Okay. Did you show them anything or were they able to find anything?

"A. Yes.

"Q. They did?

"A. I showed them the paper.

"Q. Okay. You showed them the paper you had?

"A. Yes."

In similar fashion, defense counsel began his cross-examination of Zweibelson by drawing his, and the jury's, attention back to the April, 2009 incident between the victim and the defendant:

"Q. Good afternoon, officer.

"A. Good afternoon, sir.

"Q. So, as we finished up, you'd been to 81 Natick Street before in April of 2009.

"A. Yes.

"Q. And you sort of met all the players back in April. Right?

"A. Um, back in April I only dealt with Ms. Vazquez. I did not deal with the mother on that particular day.

"Q. And you dealt with—with [the defendant] on that date.

"A. Yes.

"Q. Okay. And Ms. Vazquez told you, didn't she, that she'd been threatened with this gun on a number of different occasions?

"A. She said—she said to me that she was threatened on this particular occasion. . . .

"Q. And she made some reference to an incident that had happened about a week before, and she said that the silver firearm had been involved in that too?

"A. Yes. . . .

"Q. Now, on this—this April 30 incident, you've been told that [the defendant] was following Ms. Vazquez around, sort of unwanted attention, and was parked fairly close by this Natick Street address. Correct?

"A. Yes.

"Q. And when you got there, in fact, he was sitting right there. Right?

"A. I believe if—if—I believe a vehicle description was given out, and I—I located the vehicle approximately two blocks from the house parked at a stop sign.

"Q. [The defendant] was apprehended right then and there. Right?

"A. Yes."

Indeed, later in his cross-examination of Zweibelson, defense counsel returned to the subject of the prior incidents with the victim that had led to the defendant's arrest by asking specific questions about the case numbers of those incidents, as Zweibelson had referenced them in his police report about the kidnapping at issue here. In eliciting the previously described testimony from multiple witnesses for the state on cross-examination, defense counsel gave the jury several additional opportunities to hear about the defendant's prior bad acts toward the victim and resulting arrest.

As the trial unfolded, it became apparent that defense counsel's repeated exploration of the defendant's prior bad acts and resulting arrest was no mere accident. In fact, such testimony became a centerpiece of counsel's closing argument. First, defense counsel reminded the jury of the defendant's stormy relationship with the victim by recounting the prior incidents and their aftermath: "Alberto and Jasmin had been involved in a relationship. It has been problematic. The police have been called on more than one occasion, including officers that are involved in this incident, particularly Officer Zweibelson." Defense counsel then specifically referenced the prior incident in which the defendant threatened the victim with a gun: "[O]ne of the first officers on the scene when the police do get there is Officer Zweibelson. He knows this situation as well because

he was in on this earlier incident with the facsimile firearm that turned out to be a lighter." When commenting about how the victim's mother might have reacted to the latter incident had it really been a kidnapping, defense counsel theorized as follows: "Supposedly, from the first moment it is being expressed to the police that this is serious. This is a kidnapping. This is a guy who's been obsessed with my daughter, who's been stalking her. There'd been physical altercations." Contrasting that reaction to what the victim's mother actually did, defense counsel argued that this case was not a kidnapping, and that she knew it.

Having so used the prior bad acts and prior incarceration testimony of the state's own witnesses to undermine the state's case against him at trial, where he was found not guilty on two of the four charges against him, the defendant can hardly argue that the introduction of such evidence warrants reversal of his challenged conviction under the plain error doctrine.

II

The defendant next claims that the admission of testimony regarding his prior incarceration constituted reversible error. The defendant also seeks review of this claim under *Golding*, or alternatively, under the plain error doctrine. The following additional facts are relevant to our resolution of this claim. The defendant references two instances in which witnesses for the state testified about his prior incarceration: first, when the victim's mother testified that the defendant had previously been arrested; and second, when Quaglini testified about the defendant's DOC photograph, from which the defendant argues that a reasonable jury could have inferred that he had been incarcerated. We are not persuaded by the defendant's argument for the reasons stated in part I of this opinion. The defendant's unpreserved evidentiary claim fails to satisfy the second

prong of *Golding* for it is purely evidentiary. It also fails to meet the standard for reversal under the plain error doctrine because its admission without objection by defense counsel, who used it creatively and effectively in arguing his client's case to the jury, did not result in manifest injustice.

## III

Last, the defendant claims that prosecutorial impropriety deprived him of a fair trial. We disagree.

Before addressing the merits of this claim, we set forth the applicable standard for review. "[I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. Put differently, [impropriety] is [impropriety], regardless of its ultimate effect on the fairness of the trial; whether that [impropriety] caused or contributed to a due process violation is a separate and distinct question that may only be resolved in the context of the entire trial . . . ." (Internal quotation marks omitted.) *State* v. *Luster*, 279 Conn. 414, 428, 902 A.2d 636 (2006).

"In examining the prosecutor's argument we must distinguish between those comments whose effects may be removed by appropriate instructions . . . and those which are flagrant and therefore deny the accused a fair trial. . . . Last, we note that [w]e do not scrutinize each individual comment in a vacuum, but rather we must review the comments complained of in the context of the entire trial. . . . It is in that context that the burden [falls] on the defendant to demonstrate that the remarks were so prejudicial that he was deprived of a fair trial and the entire proceedings were tainted." (Internal quotation marks omitted.) *State* v. *Quint*, 97

Conn. App. 72, 85–86, 904 A.2d 216, cert. denied, 280 Conn. 924, 908 A.2d 1089 (2006). "In evaluating whether the [impropriety was so serious as to amount to a denial of due process], we consider the factors enumerated by [the] court in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). . . . These factors include the extent to which the [impropriety] was invited by defense conduct or argument, the severity of the [impropriety], the frequency of the [impropriety], the centrality of the [impropriety] to the critical issues in the case, the strength of the curative measures adopted, and the strength of the state's case." (Citation omitted.) *State* v. *Warholic*, 278 Conn. 354, 360–61, 897 A.2d 569 (2006).

Although a defendant need not object at trial to the alleged improprieties, nor seek review under *Golding*, "the determination of whether a new trial or proceeding is warranted depends, in part, on whether defense counsel has made a timely objection to any [incident] of the prosecutor's improper [conduct]. When defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to seriously jeopardize the defendant's right to a fair trial." (Internal quotation marks omitted.) Id., 361.

The defendant first claims that the prosecutor's introduction of prior misconduct evidence—despite her filing of a notice of intent to offer such evidence that was never ruled on by the trial court[4]—and her failure to seek a limiting instruction with respect to it, were

---

[4] The state's intent to offer prior misconduct stated the following: "The state is seeking to offer evidence of [the defendant's] prior misconduct in his trial in the above captioned case. The state intends to offer the following: Testimony of [Jasmin Vazquez] that there have been prior instances of domestic violence perpetrated upon her by the defendant. This testimony will include specific acts of violence from April 23, 2009, (H14HCR090631791) and misconduct from April 30, 2009 (H14HCR090631189). The state does not intend to offer any such evidence without a prior ruling from the court outside the presence of the jury."

improper and deprived him of a fair trial. The defendant also claims that the prosecutor's repeated elicitation of prior misconduct testimony and reliance on such evidence in her closing argument was improper and deprived him of a fair trial. The defendant argues that the failure of defense counsel to object did not waive the defendant's due process right to a fair trial.

The state counters that the defendant's unpreserved evidentiary claim is not reviewable as a claim of prosecutorial impropriety because it is merely a failed attempt to mask an evidentiary claim as a claim of prosecutorial impropriety. The state also argues that if this court were to hold that the defendant's claim constitutes a claim of prosecutorial impropriety, it still would fail because the state was not obligated to obtain a court ruling before it proffered the unobjected-to misconduct evidence, nor was it required to request a limiting instruction with respect to such evidence. The state concludes that even if there was prosecutorial impropriety, it did not violate the defendant's due process right to a fair trial.

We agree with the state that its introduction of prior misconduct evidence and failure to request a limiting instruction did not constitute prosecutorial impropriety. At no point did defense counsel object to the admission of such evidence or to the lack of a limiting instruction as to its proper use by the jury. When, to reiterate, "defense counsel does not object, request a curative instruction or move for a mistral, he presumably does not view the alleged impropriety as prejudicial enough to seriously jeopardize the defendant's right to a fair trial." (Internal quotation marks omitted.) Id. As our Supreme Court has repeatedly held, "[a]ppellate review of prosecutorial [impropriety] claims is not intended to provide an avenue for the tactical sandbagging of our trial courts, but rather, to address gross prosecutorial improprieties that clearly have deprived

a criminal defendant of his right to a fair trial." (Internal quotation marks omitted.) *State* v. *Luster*, supra, 279 Conn. 446. Here, defense counsel strategically chose not to object to the introduction of the prior misconduct evidence or to seek a limiting instruction to ensure the jury's proper use of this evidence. The defendant cannot now claim prosecutorial impropriety on the basis of his defense counsel's chosen, albeit unsuccessful, trial tactics.

Moreover, although no prosecutorial impropriety occurred in the present case, the court's general instructions to the jury properly instructed it that arguments by counsel were not evidence. Such an instruction by the trial court adequately addressed any impropriety that might be found to have occurred, although none was present in this case. See *State* v. *Young*, 76 Conn. App. 392, 406, 819 A.2d 884 (impact of prosecutorial impropriety lessened when trial court instructed jury that statements and arguments of counsel were not evidence), cert. denied, 264 Conn. 912, 826 A.2d 1157 (2003).

The judgment is affirmed.

In this opinion the other judges concurred.