******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JOSE RONALD JOSEPH
(AC 38473)

Sheldon, Beach and Harper, Js.

*Argued February 8—officially released June 27, 2017*

(Appeal from Superior Court, judicial district of
Stamford-Norwalk, Comerford, J.)

*Allison M. Near*, assigned counsel, for the appellant (defendant).

*Matthew A. Weiner*, assistant state's attorney, with whom, on the brief, were *Richard J. Colangelo, Jr.*, state's attorney, and *Maureen Ornousky*, senior assistant state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Jose Ronald Joseph, appeals from the judgment of conviction, rendered after a jury trial, of two counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2) and two counts of risk of injury to a child in violation of § 53-21 (a) (2). On appeal, the defendant claims that the trial court (1) violated his statutory right under General Statutes § 54-82m to a speedy trial, (2) violated his sixth amendment right to a speedy trial, (3) violated his right to procedural due process by not holding hearings on his motions for a speedy trial, and (4) committed plain error in providing a constancy of accusation instruction to the jury. We affirm the judgment of the trial court.

From the evidence adduced at trial, the jury reasonably could have found the following facts. The victim was eight years old when the defendant began dating her mother, E.[1] E soon became pregnant with the defendant's child and the defendant moved into her home. Although E worked two jobs and was "[a]lways working overtime," the defendant was unemployed. As a result, the defendant served as the victim's primary caregiver.

While the victim's mother was at work, the defendant began playing "games" with the victim, in which he digitally penetrated her vagina. The victim testified that, while playing "these games, [the defendant] would suck on my ear. He would twirl his fingers in my belly button. He would have me . . . sit on the couch with him with the covers over [and] there would be excessive touching in my private areas." The defendant proceeded to touch the victim in her "private areas" on a weekly basis.

That conduct continued after the birth of the defendant's daughter, A, who was the victim's half-sister. On one occasion, the victim encountered the defendant "on the couch with my little sister underneath the covers." When she observed the defendant touching A "in her private areas," the victim asked if her sister could "come play with me." As the victim recounted at trial, the defendant "refused and got angry. He stood up and pushed me. And then he told me that he knew what I wanted. And then he held me down and he penetrated my vagina [with] his penis." In the years that followed, the defendant continued to touch the victim and penetrate her with his penis on multiple occasions. That conduct transpired until the victim was nearly thirteen years old.

When the victim was almost fourteen years old, she broke down during an argument with her mother and told her that the defendant had raped and molested her. E asked the defendant if that was true; when he said no, the discussion ended. Later that night, the victim heard her mother crying in the shower. Nevertheless, E did nothing in response to her daughter's

allegations.

In the years that followed, the victim "couldn't even stay in [her] home because [the defendant] was consistently there." She therefore routinely "made arrangements so that [she] would not be home." The victim also would "cut" herself, and attempted to kill herself on multiple occasions.

When the victim was nineteen years old, she informed the police of her physical encounters with the defendant. During their investigation of those allegations, the police visited the victim's former bedroom and discovered two writings that were "scratched into the wall" behind a mirror. The writings stated, "I hate Ronald,"[2] and, "God will save me." The victim testified that she wrote those statements on her bedroom wall when she was in middle school. Detective Christie Girard, who investigated the victim's former bedroom, similarly testified that the writings appeared to have been there "[f]or a while." The defendant corroborated that assessment at trial when he testified that he discovered the "I hate Ronald" writing on the victim's bedroom wall in "February, 2002."[3] Photographs of those writings were introduced into evidence at trial.

The defendant was arrested on May 21, 2010, and subsequently was charged with two counts of sexual assault in the first degree and two counts of risk of injury to a child. On June 29, 2010, the defendant first appeared before the trial court. At that time, he was represented by a public defender, Attorney Howard A. Ehring, who requested that the matter be continued until July 20, 2010. On July 20, 2010, Ehring and the defendant again appeared before the court. At that time, Ehring requested a signed copy of the warrant and a continuance for one week.

On July 27, 2010, Ehring appeared briefly before the court to indicate that he had filed a motion for reduction of the defendant's bond. He requested a hearing on that motion on August 4, 2010. At the August 4, 2010 proceeding, Ehring requested a further continuance to ensure that "a family member [of the defendant could] speak on his behalf." Ehring also requested the assistance of a French interpreter.[4] The court granted those requests and continued the matter until August 10, 2010.

At the outset of the August 10, 2010 proceeding, Ehring informed the court of a potential conflict of interest in his representation of the defendant. He therefore filed a motion for the appointment of a special public defender and requested a continuance, which the court granted. On August 31, 2010, the defendant and Ehring appeared before the court, at which time the court appointed Attorney John W. Imhoff, Jr., as the defendant's special public defender. Because Imhoff was recovering from knee surgery, the court continued the matter for one month.

On October 1, 2010, Imhoff appeared before the court with the defendant. At that time, the prosecutor indicated that she had provided discovery to Imhoff earlier that day. Imhoff, in turn, requested a continuance for three weeks to review those materials with the defendant, which the court granted. Imhoff appeared briefly before the court on November 18, 2010, and requested a further continuance, which the court again granted.

On the morning of January 5, 2011, Imhoff and the defendant appeared before the court. The court began by noting that a "Haitian interpreter" would not be available until later in the afternoon and inquired as to whether the defendant spoke "any English at all . . . ." Imhoff replied, "Yes, Your Honor. He's written me several letters [and] his grammar is better than most of my clients." Imhoff nevertheless informed the court that the defendant "would prefer to have" the assistance of an interpreter. The court thus continued the matter until that afternoon. Later in the day, however, the prosecutor informed the court that, due to a miscommunication, the interpreter had left the courthouse. The interpreter's office further indicated that it needed "a little over a week's continuance to get somebody here." Accordingly, the court continued the matter.

Imhoff and the defendant appeared before the court two weeks later. The prosecutor informed the court that "[t]here's been no indication that [the defendant] had a willingness to plead to any of the charges that the state would proceed on." Imhoff confirmed that account and opined that the matter should be placed on the firm jury list, which the court agreed to do at that time.

On December 23, 2011, the defendant filed a pro se motion for a speedy trial. That one page motion was completed on a preprinted form and was signed by the defendant. The certification portion of that form, which indicates the date of service on the Office of the State's Attorney, was left blank. That motion was denied on January 4, 2012. The clerk who signed the "order" portion of the motion by circling "denied" and writing, "Motion filed pro se, defendant is represented by an attorney. Copy mailed to [the defendant]."

On February 7, 2012, the defendant attempted to file a second pro se motion for a speedy trial. That motion once again utilized a preprinted form. The defendant did not sign that motion or complete the certification portion to indicate that it was served on the Office of the State's Attorney. The motion was accompanied by a one paragraph note that stated: "This missive, it's to inform that I called 'Maitre' Imhoff today . . . and left a message at his office asking him to go to the clerk's office . . . to signed [and] completed the 'Motion for Speedy Trial' encl. Therefore, I respectfully implore the clerk to inform him on reception of this missive." There

is no indication in the record of any court action on that request, apart from the following handwritten notation: "3/1/12 per Attorney Imhoff: he has no intent to file this motion [and] he withdraws what was filed by his client."

On April 5, 2012, the defendant filed a third pro se motion for a speedy trial, again utilizing the same pre-printed form. Although he signed that form, which was accompanied by another one paragraph note, he did not complete the certification portion to indicate that he had served it on the Office of the State's Attorney. The clerk who signed the "order" portion of the motion circled "denied" and wrote, "(*White, J.*) Denied—filed pro se; defendant is represented, counsel does not want to file." While the defendant was attempting to file those pro se motions with the court, Imhoff filed several unrelated motions on his behalf, including a motion for a bill of particulars, a "motion for production of the Department of Children and Families' medical and psychiatric records of the state's witness," and a motion "for notice of subject matter of proposed expert testimony."

On October 17, 2012, Attorney Haldan E. Connor, Jr., filed an appearance in lieu of Imhoff as the defendant's counsel.[5] On November 1, 2012, Connor appeared before the court, at which time the prosecutor remarked that she believed that Connor "being new to the case . . . probably needs a little bit more time to talk to his client prior to setting this case down for a trial date." Connor concurred and requested a continuance until November 15, 2012, which the court granted. When Connor appeared before the court on that date, however, he informed the court that the matter "should go back on the jury list" because "[w]e weren't able to reach any kind of resolution" with the state.

On November 26, 2012, the defendant attempted to file a pro se motion to dismiss. That handwritten motion set forth ten distinct grounds, including the denial of his right to a speedy trial.[6] The defendant further requested a hearing on his motion. There is no indication in the record that the defendant provided a copy of that motion to the state or that the court took any action on the defendant's request. Furthermore, on the day that the defendant's motion to dismiss was received, a criminal caseflow coordinator, Ryan Flanagan, sent a written response to the defendant. In that correspondence, Flanagan advised the defendant that "[w]e cannot accept or file motions from defendan[ts] who are currently represented by attorneys. Our records indicate [that] Attorney Connor has filed an appearance in your case. Therefore, we cannot accept your motion and it is being returned to you. If you have any questions you can contact your attorney . . . ." The letter then recited Connor's contact information.

On April 16, 2013, Attorney Matthew Couloute filed

an appearance in lieu of Connor as the defendant's counsel.[7] On December 11, 2013, the parties appeared before the court, at which time the state indicated that the defendant faced a maximum possible exposure of eighty years incarceration on all of his pending charges. The state then formally offered the defendant the opportunity to enter a guilty plea to one count of sexual assault in the first degree in exchange for "a ten year sentence" with a two year mandatory minimum, ten years of special parole and registration as a sexual offender. The defendant rejected that offer. Couloute informed the court that the defendant proposed a counteroffer under which he would plead guilty in exchange for a sentence of time already served. The court summarily rejected that counteroffer.

At that proceeding, the defendant contended that he had not been provided with any notice of the charges against him, stating that "I want to know what's . . . the accusation. . . . I don't have no notion of the accusation. I don't have no due process. . . . [The state has not] accused me of anything." In response, the court apprised the defendant that the information contained four counts alleging sexual assault in the first degree and risk of injury to a child. Couloute then informed the court that, contrary to his client's representation, he had spoken with the defendant about those offenses and had explained to him their elements and the range of possible penalties.

Later that day, jury selection for the defendant's criminal trial commenced, and a trial was scheduled for the following month. That trial did not take place due to the death of Couloute's father. As Couloute explained to the court on February 24, 2014, in late December his "father had a stroke and was hospitalized [and] he subsequently passed away on January 7th." Couloute, therefore, was unavailable while tending to "those concerns and his estate." As a result of those "extraordinary family circumstances," the court declared a mistrial and dismissed the potential jurors by agreement of the parties. The parties agreed to begin selecting a new jury on April 8, 2014.

Couloute and the defendant appeared before the court on that date. At the outset, the court explained that, due to unforeseen circumstances, jury selection would be delayed by one day. The court then asked the parties if they wanted to put any other matters on the record. At that time, Couloute informed the court that communications with the defendant "ha[d] broken down." Couloute explained that it was the defendant's position that "no one has reviewed his file with him." Couloute indicated that he had met with the defendant one day earlier at the correctional facility and discussed his file with him, as he had done on prior occasions. Couloute also informed the court of a disagreement over trial strategy, as the defendant was "adamant" in

his desire to call certain witnesses. Couloute had advised the defendant that he would not call those witnesses, stating that "[s]trategically, I don't think it's smart to call them. And at this point in time, when it comes to that matter, I don't think it's prudent to put those witnesses on the witness list." Couloute indicated that those witnesses were minors whom he believed "add nothing to the . . . case that would help defend [the defendant]. . . . I do believe the use of these witnesses and the context in which their testimony would be offered isn't relevant, nor is it probative . . . or useful for his . . . defense." Couloute notified the court that the defendant "wanted to make sure that the court was aware that [Couloute] refused to call those witnesses." Couloute concluded by stating, "I'm not sure that [the defendant] feels that I can effectively represent him without using these witnesses. But that's the place we are in."

In response, the court noted that this development was on the eve of trial and years after the defendant's arrest. It then addressed counsel, in relevant part, as follows: "Either I can let you out of this thing and [the defendant] can represent himself if he wants to. He has that right, if he wants to do that. . . . You're a perfectly competent trial lawyer . . . and we're not going to play these games on the eve of trial here. This is purely dilatory. This is nonsense. I'm not going to let anybody manipulate the system to the detriment of the people here. . . . [N]obody on my watch will manipulate the system, Mr. Couloute. And that's exactly what we're doing here. This man has been through two or three lawyers. And every time we're about ready to go, something comes up; nonsense, absolute nonsense. If, after we pick this jury—we're going to commence the evidence on [April 22, 2014]—if you think that somebody has to be heard in terms of an offer of proof, I would be delighted to entertain that. I'll make whatever determinations I deem are appropriate. No one will see to it more than me that he'll get a fair trial."

Couloute then stated that, in light of the defendant "being adamant regarding witnesses being called, I suggest that . . . if he clearly or if he truly believes that these witnesses are imperative to his defense, that he either seek other counsel or represent himself. But for the record, I am telling the court and [the defendant], I will not be calling those witnesses." The court concluded by informing the parties that if the defendant "wishes to consider representing himself in this matter, based upon what you have told me, I will see to it that a *Faretta* canvass[8] is done here, and he can proceed on his own, if he wishes to do so. If it's that much of a fissure that has taken place, he can do that. It isn't going to delay the trial. If he wants to pick them by himself, that's up to him. . . . [T]hat's his constitutional prerogative." (Footnote added.) The court then asked the defendant if he had "anything to say about

[his] representation" by Couloute; the defendant did not respond in any manner. With that, the court stood in recess. At no time thereafter did the defendant indicate a desire to represent himself.

A trial was held over the course of four days in April, 2014. At its conclusion, the jury found the defendant guilty on all counts. The court rendered judgment accordingly and sentenced the defendant to a total effective term of twenty years incarceration, of which five years were a mandatory minimum. From that judgment, the defendant now appeals.

I

The defendant first claims that the court violated his statutory right to a speedy trial under § 54-82m. For two distinct reasons, we disagree.

Section 54-82m "requires the judges of the Superior Court to adopt rules that are necessary to assure a speedy trial for any person charged with a criminal offense . . . . With respect to a defendant who is incarcerated in a correction institution of this state pending trial, § 54-82m requires the rules to provide: (1) in any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of a criminal offense shall commence . . . within eight months from the filing date of the information or indictment or from the date of arrest, whichever is later; and (2) if a defendant is not brought to trial within the time limit set forth in subdivision (1) and a trial is not commenced within thirty days of a motion for a speedy trial made by the defendant at any time after such time limit has passed, the information or indictment shall be dismissed. Such rules shall include provisions to identify periods of delay caused by the action of the defendant, or the defendant's inability to stand trial, to be excluded in computing the time limits set forth in subdivision (1). . . . Practice Book § 43-40 then sets forth ten circumstances constituting those periods of time [that] shall be excluded in computing the [eight months] within which the trial of a defendant . . . must commence pursuant to [Practice Book §] 43-39." (Citations omitted; internal quotation marks omitted.) *State* v. *Cote*, 101 Conn. App. 527, 532–33, 922 A.2d 322, cert. denied, 284 Conn. 901, 931 A.2d 266 (2007).

"The determination of whether a defendant has been denied his right to a speedy trial is a finding of fact, which will be reversed on appeal only if it is clearly erroneous. . . . The trial court's conclusions must stand unless they are legally and logically inconsistent with the facts." (Internal quotation marks omitted.) *State* v. *Jeffreys*, 78 Conn. App. 659, 669–70, 828 A.2d 659, cert. denied, 266 Conn. 913, 833 A.2d 465 (2003), overruled in part on other grounds by *State* v. *Polanco*, 308 Conn. 242, 248, 253, 61 A.3d 1084 (2013). The proper

application of § 54-82m and our related rules of practice require a factual finding as to whether the applicable time limit has passed. That inquiry, in turn, necessitates factual findings as to whether certain periods of delay are excluded from that calculation. See Practice Book § 43-40.[9]

In *State* v. *Miller*, 121 Conn. App. 775, 786–87, 998 A.2d 170, cert. denied, 298 Conn. 902, 3 A.3d 72 (2010), this court considered a case in which the trial court summarily denied a motion for a speedy trial and the defendant thereafter took no steps to ascertain the basis of that ruling. As the court noted, "the [trial] court did not address the defendant's § 54-82m claim. The defendant never filed a motion for articulation pursuant to Practice Book § 66-5. Additionally, the record is devoid of any information that would apply to whether any of the relevant time period was subject to exclusion; see Practice Book § 43-40; from the speedy trial calculus." For that reason, this court concluded that "the record is inadequate to review the defendant's claim." In so doing, the court indicated that, without those necessary factual findings, its decision would be entirely speculative. *State* v. *Miller*, supra, 787.

In the present case, the trial court likewise did not address the claims set forth in the defendant's motions for a speedy trial, nor did it make any factual findings related thereto. Given the state of the record before us, this court cannot properly engage in meaningful review of the defendant's claim without resort to speculation and conjecture, which "have no place in appellate review." (Internal quotation marks omitted.) *New Hartford* v. *Connecticut Resources Recovery Authority*, 291 Conn. 502, 510, 970 A.2d 578 (2009).

The defendant's claim is plagued by a further infirmity. It is undisputed that the defendant was represented at all times by counsel when he attempted to file his pro se motions. As such, his claim is foreclosed by well established precedent.

In *State* v. *Gibbs*, 254 Conn. 578, 608, 758 A.2d 327 (2000), the defendant, despite being represented by counsel, made a pro se motion to dismiss predicated on "an alleged violation of his federal and state constitutional right to a speedy trial," which the trial court denied. On appeal, our Supreme Court emphasized that, although "a defendant *either* may exercise his right to be represented by counsel . . . or his right to represent himself . . . *he has no constitutional right to do both at the same time*." (Citations omitted; emphasis in original.) Id., 610. The court continued: "It is equally well settled that, having made the knowing, intelligent and voluntary choice to avail himself of the services of counsel, a defendant necessarily surrenders to that counsel the authority to make a wide range of strategic and tactical decisions regarding his case. . . . Although a represented defendant does retain the absolute right to

make a limited number of choices regarding his case . . . neither the United States Supreme Court, nor this court, has ever expanded that extremely narrow class to include the choice of whether to file a motion to dismiss for lack of a speedy trial. Indeed, such a choice clearly is one of the vast panoply of trial decisions for which one retains an experienced and competent attorney." (Citations omitted.) Id., 610–11. In light of certain representations made by the defendant's counsel to the trial court, the Supreme Court concluded that counsel's "decision not to file a motion to dismiss very likely was tactical in nature." Id., 612. For that reason, the court held that "the defendant had no authority to make the motion pro se." Id.; see also *State* v. *Cote*, supra, 101 Conn. App. 532 n.6 ("the defendant had no authority to make a pro se oral motion to dismiss on speedy trial grounds while he was represented by counsel").

That logic applies equally in the present case. Here, the defendant sought to file pro se motions for a speedy trial and to dismiss, despite the fact that he was represented by counsel at all times. Moreover, his trial counsel on multiple occasions informed the clerk's office that he did not want to pursue such motions with the court.[10] As in *Gibbs*, we must presume that counsel's decision was tactical in nature. In addition, when the defendant attempted to file his pro se motion to dismiss, the caseflow coordinator responded in writing to indicate that, consistent with the foregoing precedent, the court "cannot accept or file motions from defendan[ts] who are currently represented by attorneys." Yet at no time did the defendant request to represent himself. Having availed himself of legal counsel, the defendant lacked the authority to file the pro se motions at issue in the present case.

## II

The defendant next claims that the court violated his constitutional right to a speedy trial. The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ."[11] The sixth amendment right to a speedy trial is made applicable to the states through the due process clause of the fourteenth amendment. See *Klopfer* v. *North Carolina*, 386 U.S. 213, 222–23, 87 S. Ct. 988, 18 L. Ed. 2d 1 (1967).

"Although the right to a speedy trial is fundamental, it is necessarily relative, since a requirement of unreasonable speed would have an adverse impact both on the accused and on society." *State* v. *Johnson*, 190 Conn. 541, 544, 461 A.2d 981 (1983). In *Barker* v. *Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972), the United States Supreme Court articulated a balancing test to determine whether the right to a speedy trial has been violated, which entails consideration of the

"[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." As our Supreme Court has explained, "[u]nder *Barker*, the determination of whether such rights have been violated requires a case-by-case approach in which the court examines the factual circumstances in light of [that] balancing test . . . ." *State* v. *Smith*, 289 Conn. 598, 613, 960 A.2d 993 (2008); accord *United States* v. *Marshall*, 669 F.3d 288, 296 (D.C. Cir. 2011) ("factual findings are required pursuant to *Barker* v. *Wingo* [supra, 514]"); *United States* v. *Fredrick*, 334 Fed. Appx. 727, 728 (5th Cir. 2009) ("[i]n reviewing a speedy trial claim, this court reviews factual findings for clear error"), cert. denied, 559 U.S. 986, 130 S. Ct. 1725, 176 L. Ed. 2d 204 (2010).

In this case, the record before us lacks the requisite findings under § 54-82m, which "codifies a defendant's constitutional right to a speedy trial"; *State* v. *Hampton*, 66 Conn. App. 357, 366–67, 784 A.2d 444, cert. denied, 259 Conn. 901, 789 A.2d 992 (2001); and Practice Book § 43-40 regarding the length of delay, including any periods of time that, under our rules of practice, are excluded from the calculation thereof. See footnote 9 of this opinion. The record also does not contain any findings as to the reasons for the delay.[12] The lack of such findings also impairs our ability to properly consider the question of prejudice. We note further that, at oral argument before this court, the defendant's counsel acknowledged that "there is no evidence in this record of prejudice." Moreover, as discussed in part I of this opinion, the defendant did not properly assert his right to a speedy trial before the trial court.[13]

*State* v. *Smith*, supra, 289 Conn. 598, is instructive in this regard. In that case, "the defendant did not ask the trial court to apply *Barker* and, therefore, the court did not make the factual findings required under that test." Id., 613. Because "the record [did] not contain all of the relevant factual findings," our Supreme Court declined to review the defendant's sixth amendment claim. Id.; see also *State* v. *Friend*, 159 Conn. App. 285, 342, 122 A.3d 740 (concluding that record was inadequate to review speedy trial claim), cert. denied, 319 Conn. 954, 125 A.3d 533 (2015). Guided by that precedent, we decline to further consider the defendant's claim.

### III

The defendant also contends that the court violated his right to procedural due process by failing to hold hearings on his pro se motions for a speedy trial. The defendant did not preserve this claim at trial and now seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).[14] Even if he could surmount the fact that the record before us is largely silent as to what transpired before

the trial court with respect to his pro se motions for a speedy trial, he still could not prevail, as he lacked authority to file those motions under established law. See *State* v. *Gibbs*, supra, 254 Conn. 612; *State* v. *Cote*, supra, 101 Conn. App. 532 n.6. Moreover, the defendant's counsel in the present case affirmatively indicated to the trial court that he did not want to pursue those motions. See footnote 10 of this opinion. In light of the foregoing, the defendant's claim must fail.

IV

The defendant maintains, as a final matter, that the court committed plain error in providing a constancy of accusation charge to the jury. We disagree.

The following additional facts are relevant to the defendant's claim. At trial, the victim was asked if she had spoken to any peers about "what had happened" with the defendant. The victim testified that, when she was sixteen years old, she confided in her "best friend," D, about that experience. D later testified at trial as a constancy of accusation witness. In his testimony, D stated that, while they were in high school together, the victim told him that she was sexually assaulted by a person she described as her stepfather "when she was a little girl." D further indicated that the victim did not provide any specifics regarding the nature of those assaults.

The victim's mother, E, also testified as a constancy of accusation witness. The victim earlier had testified that she had told E that the defendant had raped and molested her. In her testimony, E described the time that, during an argument regarding the defendant, her daughter "lashed out that he had touched her." E testified that the victim informed her that the defendant had sexually assaulted her, and when and where those assaults transpired.

Following the close of evidence, the court held a charging conference with the parties. At the outset, the court noted that "counsel has had a copy of the charge in hand for a couple of days." The court then proceeded to review the substance of its jury charge with the parties. With respect to its instruction on constancy of accusation testimony,[15] the court stated: "On the constancy of accusation, there were two witnesses that were constancy witnesses, in part the mother of the [victim] here, and [D]. Do you both agree that the constancy charge is a fair charge to set forth [to the jury]?" Both defense counsel and the prosecutor answered affirmatively.

On appeal, the defendant reverses course and contends that the court's constancy of accusation instruction was improper. In response, the state submits that the defendant has waived his claim of instructional error.

In *State* v. *Kitchens*, 299 Conn. 447, 482–83, 10 A.3d

942 (2011), our Supreme Court held that "when the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal. Such a determination by the reviewing court must be based on a close examination of the record and the particular facts and circumstances of each case."

Those criteria all are satisfied in the present case. The court provided counsel with a copy of its proposed jury charge days in advance. It thereafter conducted a charging conference, at which it solicited feedback from the parties. During that conference, defense counsel raised no objection to the constancy of accusation instruction. Indeed, counsel expressly indicated that he believed that the instruction was a "fair" one. Accordingly, we conclude that the defendant implicitly waived his jury instruction claim under the rule articulated in *Kitchens*.

That determination does not end our inquiry, as the defendant claims that the judgment should be reversed pursuant to the plain error doctrine. See Practice Book § 60-5. During the pendency of this appeal, our Supreme Court clarified that "a *Kitchens* waiver does not preclude plain error review." *State* v. *McClain*, 324 Conn. 802, 812, 155 A.3d 209 (2017). We therefore consider the merits of the defendant's claim.

Review under the plain error doctrine is "reserved for only the most egregious errors"; id., 814; and "truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Myers*, 290 Conn. 278, 289, 963 A.2d 11 (2009). To prevail under the plain error doctrine, an appellant must demonstrate, as a threshold matter, the existence of an error "that it is patent [or] readily [discernible] on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable." (Internal quotation marks omitted.) *State* v. *McClain*, supra, 324 Conn. 812. The defendant has not met that substantial burden.

Under Connecticut law, constancy of accusation evidence—which generally consists of testimony by "a person to whom a sexual assault victim has reported the assault"—is "admissible only to corroborate the victim's testimony and not for substantive purposes." *State* v. *Troupe*, 237 Conn. 284, 304, 677 A.2d 917 (1996).[16] The instruction provided in the present case comports with that precedent, as it informed the jury that the constancy of accusation testimony provided by D and E was "admitted solely to corroborate [the

victim's] testimony here in court, it's to be considered by you for the limited purpose of determining the credibility and the weight to be given her testimony before you. In other words, it's not admitted for the truth of those statements but only for the purpose of corroborating what she testified to you—testified before you, here in court."

The defendant nonetheless argues that the jury likely was misled by the court's failure to define the term "corroboration." Our appellate courts have rejected such a claim twice in the past ten months. See *State* v. *Daniel W. E.*, 322 Conn. 593, 609, 142 A.3d 265 (2016) (concluding that court's constancy of accusation instruction "accurately portrayed the law and did not mislead the jury" despite "the trial court's failure to define the word 'corroborate' "); *State* v. *Roberto Q.*, 170 Conn. App. 733, 744–45, 155 A.3d 756 (same), cert. denied, 325 Conn. 910,      A.3d      (2017). In the present case, the court plainly advised the jurors of the limited purpose for which they could consider the constancy of accusation testimony provided by D and E. Accordingly, we cannot conclude that the court's constancy of accusation instruction constituted an error "obvious in the sense of not debatable." (Internal quotation marks omitted.) *State* v. *McClain*, supra, 324 Conn. 812.

Furthermore, the defendant has not demonstrated that manifest injustice resulted from the court's allegedly improper instruction, as the plain error doctrine requires. See *State* v. *Coward*, 292 Conn. 296, 307, 972 A.2d 691 (2009). Although the defendant on appeal argues that the court should have defined the term " 'corroboration' such that the jury would be able to determine the difference between an appropriate use of constancy [of] accusation evidence (to prove that a complaint was made), and an inappropriate use of [such] evidence (to prove that the complaint was true)," the record reveals that the defendant expressly encouraged the latter practice at trial. Specifically, his counsel elicited testimony from E indicating that she did not believe the victim's initial disclosure of sexual assault, and then argued to the jury that it should discredit the victim's testimony in light of that evidence.[17] When a party so utilizes allegedly improper evidence, it cannot prevail under the plain error doctrine. See, e.g., *State* v. *Ampero*, 144 Conn. App. 706, 715, 72 A.3d 435 ("[t]he defendant cannot show manifest injustice because his defense counsel waived this claim by failing to take action against the admission of such evidence and then strategically used the evidence to his advantage"), cert. denied, 310 Conn. 914, 76 A.3d 631 (2013); *State* v. *Hawkins*, 51 Conn. App. 248, 256, 722 A.2d 278 (1998) ("[h]aving used some of this [the constancy of accusation] evidence to his advantage in his closing argument, the defendant cannot now establish that any alleged improper evidentiary ruling . . . deprived him of a fair

trial"), cert. denied, 281 Conn. 901, 916 A.2d 46 (2007). The defendant's invocation of the plain error doctrine, therefore, is unavailing.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[2] At trial, the victim identified the defendant as "Ronald Joseph."

[3] In February, 2002, the victim was eleven years old.

[4] The record reflects that the defendant is a citizen of Canada who speaks in a French dialect.

[5] The record before us is bereft of any explanation for that substitution. The record further does not contain any indication that Connor was a court-appointed attorney.

[6] The defendant's November 26, 2012 motion to dismiss states in relevant part that he "requests the court to dismiss the information on the ground that:
"(1) The information failed to charge and offense; or
"(2) The institution of the prosecution was defective; or
"(3) The statute of limit has expired; or
"(4) The court has no jurisdiction over the subject matter; or
"(5) The court has no jurisdiction over the defendant; or
"(6) There is insufficient evidence or cause to justify the bringing or continuing of such information or the placing of the defendant on trial; or
"(7) The defendant has been denied a speedy trial;
"(8) The law defining the offense charges is unconstitutional or otherwise invalid; or
"(9) The affidavit relied on for the issuance of the arrest warrant is insufficient; or
"(10) Any other legally sufficient grounds the defendant can establish."

[7] The record lacks any explanation for that substitution. In the appendix to its appellate brief, the state has included a copy of a petition for a writ of habeas corpus filed by the defendant on December 31, 2014. In that petition, the defendant avers that Couloute was privately retained. We properly may take judicial notice of that pleading. See *Karp* v. *Urban Redevelopment Commission*, 162 Conn. 525, 527, 294 A.2d 633 (1972) ("[t]here is no question . . . concerning our power to take judicial notice of files of the Superior Court, whether the file is from the case at bar or otherwise"); *Folsom* v. *Zoning Board of Appeals*, 160 Conn. App. 1, 3 n.3, 124 A.3d 928 (2015) (taking "judicial notice of the plaintiff's Superior Court filings in . . . related actions filed by the plaintiff").

[8] See *Faretta* v. *California*, 422 U.S. 806, 835, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975).

[9] Practice Book § 43-40 outlines various circumstances in which periods of time are excluded from the calculation of the time limitations of § 54-82m. They include periods of time attributable to, inter alia, continuances granted by the judicial authority at the request of the defendant, the unavailability of counsel for the defendant, and "delay occasioned by exceptional circumstances." Practice Book § 43-40 (10).

[10] As the defendant notes in his principal appellate brief, "his attorney repeatedly informed the clerk that he did not want to file the motion for a speedy trial."

[11] Although the defendant also alleges a violation of his right under article first, § 8, of the Connecticut constitution, he has provided no independent analysis thereof. Accordingly, we consider his claim under the federal constitution alone. See *State* v. *Saturno*, 322 Conn. 80, 113 n.27, 139 A.3d 629 (2016).

[12] As the state emphasizes in its appellate brief, the record is silent as to why no proceedings transpired before the court from January 5, 2011 to October 17, 2012, and from November 15, 2012 to December 11, 2013.

[13] We reiterate that, pursuant to *State* v. *Gibbs*, supra, 254 Conn. 612, the defendant lacked authority to file his pro se motions for a speedy trial and to dismiss. Furthermore, it is undisputed that the defendant failed to serve copies of those motions on the state. In so doing, he undermined an essential purpose of § 54-82m. As the Supreme Court has observed, the legislature enacted that statute "with the intent that the defendant's motion would alert . . . the state that the clock was running and that, to avoid dismissal of the charges, the defendant would have to be afforded a trial within thirty

days. . . . The legislature recognized that institutional negligence might occur . . . and that the defendant's speedy trial motion would remind the state that it must commence the trial within thirty days or face a dismissal. . . . In other words, *the motion for a speedy trial is supposed to be the state's wake up call.* It is intended to [give] the state another crack from preventing that individual from being set free." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *McCahill*, 265 Conn. 437, 451–52, 828 A.2d 1235 (2003). No such wake-up call was provided to the state in the present case.

[14] Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40.

[15] The court's instruction on constancy of accusation testimony stated in relevant part: "If you find that a witness made statements at other times about the case, whether oral or written, you may consider whether those statements were consistent or inconsistent with what the witness has testified to here before you in court when weighing their credibility.

"In a case such as this, you may also consider any delay in the reporting of the alleged incident in evaluating the credibility of the [victim] and the weight to be given her testimony. In this regard, you'll recall that you heard some testimony in the case from Dr. Lawrence Rosenberg, who testified as to child grooming and of delayed reporting by children, amongst other things. Any opinions rendered by him are not binding upon you. Such expert testimony is subject to review at your hands just as any other testimony. You will size up and give the weight to that testimony as you deem appropriate.

"Now, let me talk to you about a couple of other things before we take a quick break. Let me talk to you about something called constancy witnesses. Ordinarily, when someone makes a statement out of court not under oath, it's inadmissible. We normally call that hearsay; it's not tested by an oath. But there are exceptions, and we have encountered one in this case. The state has offered evidence of statements made by the [victim] out of court to certain individuals concerning the alleged crimes, and you'll recall those statements were admitted into evidence.

"Please recall the statements made by the [victim] to her mother and to her friend, [D]. This evidence is admitted solely to corroborate her testimony here in court; it's to be considered by you for the limited purpose of determining the credibility and the weight to be given her testimony before you. In other words, it's not admitted for the truth of those statements but only for the purpose of corroborating what she testified to you—testified before you, here in court."

[16] In his principal appellate brief, the defendant argues that "[t]his case provides yet another instance of why this court should overrule *Troupe* and its progeny." We are not the proper audience for such claims. As an intermediate appellate body, it is axiomatic that this court is "bound by Supreme Court precedent and [is] unable to modify it . . . . [W]e are not at liberty to overrule or discard the decisions of our Supreme Court . . . . [I]t is not within our province to reevaluate or replace those decisions." (Citation omitted; internal quotation marks omitted.) *State* v. *Smith*, 107 Conn. App. 666, 684–85, 946 A.2d 319, cert. denied, 288 Conn. 902, 952 A.2d 811 (2008).

[17] In his closing argument to the jury, defense counsel stated in relevant part: "[T]ake into consideration the lack of affect when [the victim] told the story that she used, the lack of details, the lack of corroboration of the story, the actions afterward—when I say afterward, after the disclosure. I wonder why after the disclosure to the mother, everybody went on about their business. The mother truly didn't believe her to the point where she just let the child just go back to the same places, the same routines and everything else. So, if the mother doesn't believe her, eight, nine years later, how are you supposed to believe her? How are you supposed to convict someone on a statement made that far from the time of the event where the mother didn't believe it, when it was going on?"