******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* TYQUAN TURNER
## (AC 40248)

DiPentima, C. J., and Bright and Eveleigh, Js.

*Syllabus*

Convicted of the crimes of felony murder, robbery in the first degree and conspiracy to commit robbery in the first degree in connection with the shooting death of the victim, the defendant appealed. The defendant and an accomplice, C, allegedly had approached the victim, shot him and took a chain and medallion from around the victim's neck. The defendant and C then drove to a jewelry store where they sold the chain and medallion. The day after the shooting, the police attempted to stop a vehicle in which the defendant and C were riding, but they got out of the vehicle and fled on foot. The police recovered a cell phone dropped by the defendant while he was fleeing, and when C was apprehended, he admitted to the police that he had been in possession of the chain and medallion. The police subpoenaed the defendant's call records from his cell phone carrier and performed a call detail mapping analysis that detailed the movement of the cell phone on the day of the shooting. At trial, the defendant's cell phone records, along with testimony from W, the officer who had performed the call detail mapping analysis, were admitted into evidence without objection by the defendant. Defense counsel declined to cross-examine W, did not object to the trial court's qualification of W as an expert in its jury instructions and relied on portions of W's testimony during closing argument to the jury. On appeal, the defendant claimed, inter alia, that the trial court improperly admitted documentary and testimonial evidence regarding certain cell phone coverage maps in violation of his federal due process right to a fair trial. *Held*:

1. There was sufficient evidence presented at trial to support the defendant's conviction of conspiracy to commit robbery in the first degree; the jury's conclusion that the defendant and C had agreed to engage in conduct constituting robbery in the first degree was reasonable and logical in light of the evidence and the inferences that could have been drawn therefrom, as the jury reasonably could have found, inter alia, that the defendant and C had emerged from a parking lot, robbed and shot the victim, and then drove to the jewelry store where they sold the chain and medallion, and that A, the mother of the defendant's daughter, deposited a check from the jewelry store into her bank account, withdrew cash the next day in the amount of the check and gave it to the defendant.

2. The defendant could not prevail on his unpreserved claim that his due process right to a fair trial was violated when the trial court qualified W as an expert witness and admitted the cell phone coverage maps into evidence; the defendant's claim was evidentiary in nature and not of constitutional magnitude, and, thus, was not reviewable pursuant to *State* v. *Golding* (213 Conn. 233), and there was no manifest injustice that warranted reversal of the judgment under the plain error doctrine, as defense counsel made a strategic decision not to object to the cell phone evidence or to W's qualification as an expert and then relied on that evidence during his closing argument to the jury.

3. The defendant could not prevail on his claim that multiple instances of prosecutorial impropriety during closing arguments deprived him of his due process right to a fair trial: the prosecutor did not refer to facts that were not in evidence or invite speculation when he urged the jury to find where the defendant was at particular times on the basis of the cell phone evidence, as the jury reasonably could have inferred from the cell phone coverage maps and W's testimony that the defendant was in different areas of the city at particular times on the day of the shooting, the prosecutor, who was arguing from the evidence presented at trial, did not vouch for his own credibility when he commented about the defendant's conduct in offering a fake address and identification to the police, and the prosecutor's comment that the defendant did things that pointed only to his guilt and not to his innocence did not suggest to the jury that the defendant had the burden to prove his innocence,

as the comment was followed by references to certain of the defendant's actions after the shooting from which the jury could have inferred a consciousness of guilt; moreover, the prosecutor's one sarcastic remark about the defendant's ability to cash checks was not improper, as it was made in response to defense counsel's argument that evidence that the defendant helped C cash the check did not prove that the defendant committed the robbery.

4. The defendant's unpreserved claim that the trial court's second supplemental instruction misled the jury about the essential elements of robbery in the first degree was unavailing; the defendant conceded that the court properly charged the jury regarding the elements of robbery in the first degree in its original instruction and first supplemental instruction, and with respect to the second supplemental charge, the court properly answered the specific question that was raised by the jury and did not contradict either of its previous instructions, and, therefore, it was not reasonably possible that the jury was misled by the court's second supplemental instruction.

Argued December 5, 2017—officially released May 1, 2018

*Procedural History*

Substitute information charging the defendant with the crimes of murder, felony murder, robbery in the first degree and conspiracy to commit robbery in the first degree, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *Kwak, J.*; thereafter, the court denied the defendant's motion for a judgment of acquittal; verdict and judgment of guilty of felony murder, robbery in the first degree and conspiracy to commit robbery in the first degree, from which the defendant appealed. *Affirmed.*

*Ann M. Parrent*, assistant public defender, for the appellant (defendant).

*Harry Weller*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *David L. Zagaja*, senior assistant state's attorney, for the appellee (state).

*Opinion*

EVELEIGH, J. The defendant, Tyquan Turner, appeals from the judgment of conviction, rendered after a jury trial, of felony murder in violation of General Statutes § 53a-54c, robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), and conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (2). On appeal, the defendant claims: (1) there was insufficient evidence presented at trial to convict him of conspiracy to commit robbery in the first degree; (2) the trial court improperly admitted documentary and testimonial evidence regarding cell phone coverage maps in violation of his federal due process right to a fair trial; (3) prosecutorial improprieties during the state's closing and rebuttal arguments deprived him of his right to a fair trial; and (4) the trial court improperly instructed the jury with respect to robbery in the first degree.[1] We disagree and, accordingly, affirm the judgment of the trial court.[2]

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. On the afternoon of July 13, 2013, the victim, Miguel Rodriguez, was standing on the sidewalk in front of 10-12 Flatbush Avenue in Hartford. Charlene Lara, a resident of the neighboring 18 Flatbush Avenue, was smoking a cigarette on her second floor porch. At approximately 3:54 p.m., Lara observed two people approach the victim from an open parking lot alongside 10-12 Flatbush Avenue, heard two series of gunshots, and called 911. Shortly thereafter, police and emergency response personnel found the victim, who was being tended to by residents of 10 Flatbush Avenue. The victim later was pronounced dead at Hartford Hospital.

Approximately seven or eight friends and family members of the victim were present when the shooting occurred. Those who were interviewed at the scene, although generally unwilling to provide any information about the incident or a suspect, indicated that the victim was missing a gold chain and medallion.[3] Police officers, however, located two eyewitnesses who were willing to give statements regarding the incident, Lara and Jose DeJesus.[4] A firearm or spent shell casings were never recovered.

On July 14, 2013, Dennis DeMatteo, a detective with the Hartford Police Department, received a phone call from an "[associate] of the family" who was "[o]ne of the friends and family" of the victim. The caller stated that the defendant was responsible for the victim's death and that the victim's family members and associates were planning retaliation. The caller also provided a photograph of the defendant, which DeMatteo circulated within his department. On July 16, 2013, Audley McLean, an owner of K & M Jewelry Corporation (K &

M) contacted the Hartford Police Department. McLean stated that he had purchased a gold chain and medallion from Lorenzo Christian between 4 p.m. and 6 p.m. on July 13, 2013. McLean provided a photograph of the jewelry, a copy of the check, and Christian's state identification card to the police. Acting on that information, DeMatteo traced the check to a Webster Bank branch, located on Park Street in Hartford, and an account owned by Alexandra Colon, the mother of the defendant's daughter.

On August 6, 2013, Detective George Watson, while driving an unmarked police vehicle, stopped at an intersection in the north end of Hartford. Watson observed the defendant and Christian, whom he recognized from flyers circulating within his department, pull alongside his vehicle. The defendant then "took off." Watson, along with other Hartford police officers, pursued the vehicle until the defendant drove into the back of a building complex that had no exit. The defendant and Christian abandoned the vehicle, jumped a nearby fence, and continued on foot. The defendant was not apprehended but dropped his cell phone as he was exiting the vehicle. The cell phone was recovered by Hartford police. Christian was apprehended by Hartford police and admitted that he had been in possession of the chain and medallion.

On August 17, 2013, DeMatteo interviewed Colon at the Hartford Police Department. Colon admitted to cashing a check for the defendant and Christian. Colon also was shown the cell phone recovered on August 6, 2013, and, on the basis of a crack in the phone's screen, she identified it as the defendant's and provided DeMatteo with the defendant's cell phone number. With that number, DeMatteo confirmed that Sprint Corporation (Sprint) was the defendant's cell phone carrier and, thereafter, a subpoena was issued, ordering Sprint to produce the defendant's cell phone records from July 13, 2013, the day the homicide occurred, through August 6, 2013, the day the phone was recovered. Sprint's response to the initial subpoena was incomplete and did not include any records for July 13, 2013. The subscription information, however, indicated that the cell phone number was changed on July 14, 2013, the day after the crime, at the request of a person by the name of "Patrick." In response to a subsequent subpoena, Sprint produced the cell phone records, associated with that prior phone number, for July 13, 2013.

DeMatteo sent the cell phone records and locations of investigative interest to Andrew Weaver, a sergeant in the Hartford Police Department's special investigations division, who performed a call detail mapping analysis.[5] Weaver input that data into a computer program called Oculus GeoTime, and produced a time lapse video visually representing the movement of the defendant's cell phone between approximately 3:04 p.m. and 6:48 p.m.

on the day of the crime.[6] Weaver also took screenshots of the video at different times between approximately 3:24 p.m. and 5:08 p.m. on the day of the crime.

On August 25, 2013, the defendant was approached by Hartford police Officer Carlos Montanez. The defendant identified himself as Aaron Patrick and presented fake identification under the same alias, which listed 7 Cherry Street as his residence. The defendant initially was charged with interfering with police on the basis of his having presented that fake identification. On September 11, 2013, the defendant was arrested in connection with the victim's death and subsequently charged with murder in violation of General Statutes § 53a-54a, felony murder, robbery in the first degree, and conspiracy to commit robbery in the first degree.

A six day jury trial began on May 18, 2015. The state presented the testimony of DeJesus,[7] Lara,[8] and several members of the Hartford Police Department. The state introduced the defendant's cell phone records into evidence during its direct examination of Ray Clark, a custodian of records at Sprint. Clark identified the defendant's account subscription information, July 14, 2013 customer service record, and call detail records. Those three documents were admitted into evidence without objection. Thereafter, the state conducted its direct examination of Weaver and elicited testimony regarding the call detail mapping analysis he performed. The state introduced the time lapse video and snapshots that Weaver produced, which were admitted into evidence without objection. On May 26, 2015, the jury found the defendant guilty of felony murder, robbery in the first degree, and conspiracy to commit robbery in the first degree.[9] The trial court thereafter rendered judgment in accordance with the jury's verdict and sentenced the defendant to a total effective term of seventy years of incarceration, thirty of which are a mandatory minimum sentence. This appeal followed.[10] Additional facts and procedural history will be set forth as necessary.

I

The defendant claims that there was insufficient evidence presented at trial to convict him of conspiracy to commit robbery in the first degree.[11] Specifically, he argues that there was "no evidence apart from the alleged robbery from which an agreement to commit that crime could be inferred." The defendant filed a motion for a judgment of acquittal at the close of the state's case but failed to renew this motion at the close of all of the evidence. Nevertheless, he seeks review of this unpreserved claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). We review the defendant's unpreserved sufficiency of the evidence claim as though it had been preserved. See *State* v. *Revels*, 313 Conn. 762, 777, 99

A.3d 1130 (2014) ("[A]ny defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right, and would therefore necessarily meet the four prongs of *Golding*. . . . Accordingly . . . there is no practical significance . . . for engaging in a *Golding* analysis." [Citation omitted; internal quotation marks omitted.]), cert. denied, U.S. , 135 S. Ct. 1451, 191 L. Ed. 2d 404 (2015). Upon review of the record, we conclude that there was sufficient evidence presented at trial to convict the defendant of conspiracy to commit robbery in the first degree.

We first set forth the relevant legal principles governing sufficiency of the evidence claims. "In reviewing the sufficiency of the evidence to support a criminal conviction we apply a [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evi-

dence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Bush*, 325 Conn. 272, 285–86, 157 A.3d 586 (2017); *State* v. *Steele*, 176 Conn. App. 1, 10–12, 169 A.3d 797, cert. denied, 327 Conn. 962, 172 A.3d 1261 (2017).

The crimes of conspiracy and robbery in the first degree are codified at §§ 53a-48 and 53a-134, respectively.[12] To establish the defendant's guilt with respect to conspiracy to commit robbery in the first degree, "the state must show that there was an agreement between two or more persons to engage in conduct constituting [robbery in the first degree] and that the agreement was followed by an overt act in furtherance of the conspiracy . . . . The state must also show intent on the part of the accused that conduct constituting [robbery in the first degree] be performed. . . . The existence of a formal agreement between the parties need not be proved; it is sufficient to show that they are knowingly engaged in a mutual plan to do a forbidden act. . . .

"Because of the secret nature of conspiracies, a conviction usually is based on circumstantial evidence. . . . Consequently, it is not necessary to establish that the defendant and his [coconspirator] signed papers, shook hands, or uttered the words we have an agreement. . . . [*T*]*he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts.*" (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Taft*, 306 Conn. 749, 756–57, 51 A.3d 988 (2012); see also *State* v. *Taylor*, 177 Conn. App. 18, 31–32, 171 A.3d 1061 (2017), cert. denied, 327 Conn. 998, 176 A.3d 555 (2018).

The jury reasonably could have found the following additional facts. On the afternoon of July 13, 2013, at approximately 3:06 p.m., the defendant left his residence at 7 Cherry Street in Hartford and drove to Lenox Street, where Christian resided. At approximately 3:25 p.m., the defendant and Christian left the area of Lenox Street and drove to 10-12 Flatbush Avenue in Hartford. At approximately 3:54 p.m., the defendant and Christian emerged from the open parking lot alongside 10-12 Flatbush Avenue and approached the victim. The defendant grasped the chain and medallion around the victim's neck and fatally shot the victim in the abdomen with a chrome revolver. The defendant and Christian drove to K & M, located at 1154 Albany Avenue in Hartford. Christian entered K & M alone, and presented the chain and medallion to McLean. McLean conducted an appraisal and offered to pay Christian $1134. Christian exited K & M and consulted with the defendant about the offer. Christian subsequently reentered K & M and accepted McLean's offer. After leaving K & M, the defendant and Christian attempted to cash McLean's check

but were unsuccessful. The defendant called Colon and asked her to cash the check. The defendant and Christian picked up Colon at her house and drove to a Webster Bank branch located on Park Street in Hartford, where Colon deposited the check in her account. The defendant then dropped off Colon and Christian at their respective residences before returning to 7 Cherry Street. The following day, at the defendant's request, Colon withdrew cash in the amount of the check and gave it to the defendant.

The jury's conclusion that the defendant and Christian agreed to engage in conduct constituting robbery in the first degree is reasonable and logical in light of the evidence before it and the inferences that may be drawn therefrom. See *State* v. *Crosswell*, 223 Conn. 243, 255–56, 612 A.2d 1174 (1992) (sufficient evidence to support finding that defendant agreed that gun would be used during robbery when he stood by silently when gun was displayed); *State* v. *Louis*, 163 Conn. App. 55, 68, 134 A.3d 648 (sufficient evidence to support finding that defendant agreed to commit robbery when he entered store with coconspirators and did not flee when gun was displayed), cert. denied, 320 Conn. 929, 133 A.3d 461 (2016); *State* v. *Elsey*, 81 Conn. App. 738, 747, 841 A.2d 714 (sufficient evidence to support finding that defendant agreed to conspiracy when defendant arrived at crime with coconspirators, stayed at scene while crimes were committed and left scene with coconspirators), cert. denied, 269 Conn. 901, 852 A.2d 733 (2004). Mindful that in determining the sufficiency of the evidence we consider its cumulative effect and construe the evidence in the light most favorable to sustaining the verdict, we conclude that there was sufficient evidence presented at trial to convict the defendant of conspiracy to commit robbery in the first degree.

## II

We next address the defendant's claim that the trial court's qualification of Weaver as an expert witness and admission of cell phone coverage maps deprived him of his due process right to a fair trial. Specifically, the defendant argues that he was convicted on the basis of "scientific evidence that does not satisfy the reliability safeguards now required by [*State* v. *Edwards*, 325 Conn. 97, 156 A.3d 506 (2017)]."[13] The defendant, however, failed to preserve this claim at trial and seeks review pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40, and, alternatively, the plain error doctrine. We decline to review the merits of the defendant's unpreserved evidentiary claim.

## A

Pursuant to the *Golding* doctrine, "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim

of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. . . . The first two steps in the *Golding* analysis address the reviewability of the claim, while the last two steps involve the merits of the claim. . . . The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Citations omitted; internal quotation marks omitted.) *State* v. *Steele*, supra, 176 Conn. App. 15 n.8; see also *State* v. *Biggs*, 176 Conn. App. 687, 705–706, 171 A.3d 457, cert. denied, 327 Conn. 975, 174 A.3d 193 (2017). Upon review of the record, we conclude that the defendant's claim fails under *Golding*'s second prong because it is evidentiary in nature and not "of constitutional magnitude alleging the violation of a fundamental right . . . ." *State* v. *Golding*, supra, 213 Conn. 239–40.

In *State* v. *Edwards*, supra, 325 Conn. 97, our Supreme Court was presented with two issues of first impression, specifically, whether: (1) "a police officer needed to be qualified as an expert witness before he could be allowed to testify regarding cell phone data"; id., 127; and (2) "the evidence introduced through [the police officer] was of a scientific nature such that a [*Porter* hearing][14] was required." (Footnote added.) Id., 129. The court answered those two questions in the affirmative, concluding that the trial court improperly admitted cell phone data and cell tower coverage maps into evidence without qualifying the police officer as an expert and conducting a *Porter* hearing to determine whether the officer's testimony was based on a reliable scientific methodology. See id., 133. The court then conducted a harmless error analysis. See id. ("[*w*]*hen an improper evidentiary ruling is not constitutional in nature*, the defendant bears the burden of demonstrating that the error was harmful" [emphasis added; internal quotation marks omitted]).

In the present case, the defendant, nevertheless, argues that this evidentiary claim is of constitutional magnitude because "it asserts that the improper admission of evidence violated [his] due process right to a fair trial." We are not persuaded by the defendant's attempt to "clothe an ordinary evidentiary issue in constitutional garb to obtain appellate review." (Internal quotation marks omitted.) *State* v. *Marrero-Alejandro*, 159 Conn. App. 376, 398, 122 A.3d 272 (2015), appeal dismissed, 324 Conn. 780, 154 A.3d 1005 (2017). Accordingly, we decline to review the merits of the defendant's claim because it fails to satisfy *Golding*'s second prong.

B

The defendant alternatively argues that reversal of his conviction is warranted because the trial court's qualification of Weaver as an expert witness and admission of cell phone coverage maps constituted plain error.[15] In response, the state argues that reversal of the defendant's conviction under the plain error doctrine is unwarranted because the claim was "tactically waived." We agree with the state. In the present case, because it clearly appears that defense counsel made a strategic decision not to object to the cell phone evidence or Weaver's qualification and then relied on that evidence during his closing argument, there is no manifest injustice that warrants reversal under the plain error doctrine. See *State* v. *Ampero*, 144 Conn. App. 706, 715, 72 A.3d 435 (defendant could not demonstrate manifest injustice where defense counsel made strategic decision to not object to evidence and then used evidence to defendant's advantage), cert. denied, 310 Conn. 914, 76 A.3d 631 (2013); see also *State* v. *Joseph*, 174 Conn. App. 260, 283–84, 165 A.3d 241 ("[w]hen a party so utilizes allegedly improper evidence, it cannot prevail under the plain error doctrine"), cert. denied, 327 Conn. 912, 170 A.3d 680 (2017).

As we previously detailed, defense counsel did not object to the admission of the Sprint records or coverage maps into evidence. Moreover, during his cross-examination of Clark, defense counsel elicited testimony that cell site information could not be used to determine the exact location of a cell phone at a specific time, but could be used to establish that the phone was in the "vicinity" of a cell site. That testimony prompted the following exchange:

"[Defense Counsel]: And how would you define vicinity?

"[The Witness]: Well, within the range of the cell site.

"[Defense Counsel]: And do you know what the range is?

"[The Witness]: . . . [E]very cell site [is going to] have a different range. The only way to determine more accurate[ly] would be to map every cell site potentially and look at one [cell site] in particular relationship to the others to get an idea. But as a general rule of thumb in an urban environment, up to two miles would be the rule that I would go by if I just had to choose an arbitrary number."

Moreover, during the state's direct examination of Weaver, defense counsel did not object to Weaver's qualifications or any testimony concerning his analysis. Of import, Weaver testified that, on the basis of the cell site and sector that a call is recorded on, he could conclude that a cell phone was in a certain coverage area when a call was made or received.[16] Thereafter,

defense counsel declined to cross-examine Weaver and did not object to the trial court's qualification of Weaver as an expert in its jury instructions.

During defense counsel's closing argument, he relied on portions of Weaver's testimony. Specifically, defense counsel argued, in relevant part: "They talk about the movement of the phone, but they don't tell you who has the phone. . . . There's no testimony saying [the defendant] had the phone. Who could have had that phone? Ask yourself. [Christian]? Yeah. He very well could have. . . . He's right by where the pawn store is. And you look at all those [maps] . . . it's a grid of a mile and a half. So . . . they're trying to cookie-cut everything. But . . . don't lose sight of it. How is it his phone all of a sudden? Who says so? . . .

"So, I talked about the phone, and [Weaver] said, you know what, I can't tell you which way they were driving. I can't tell you who had the phone. I can't even tell you really where it was. I can tell you where they weren't. Well, it looks like they're back and forth."

Accordingly, because defense counsel assented to the admission of the cell phone evidence that the defendant now claims deprived him of his right to a fair trial, and, thereafter, used it in a manner indicating that the decision was made as a matter of trial tactics, we conclude that the defendant cannot prevail on his claim of plain error.[17] See *Mozell* v. *Commissioner of Correction*, 291 Conn. 62, 73, 967 A.2d 41 (2009) ("[t]o allow the [defendant] to seek reversal now that his trial strategy has failed would amount to allowing him to induce potentially harmful error, and then ambush the state with that claim on appeal" [internal quotation marks omitted]).

### III

We next address the defendant's claims that prosecutorial improprieties during closing arguments deprived him of his due process right to a fair trial. Specifically, the defendant claims that the prosecutor improperly: (1) commented on the cell phone evidence in the record; (2) injected his personal credibility into the case; (3) suggested to the jury that it could rely on the absence of innocent explanations for the defendant's conduct as evidence of his guilt; and (4) used sarcasm in response to defense counsel's closing argument. The state contends that none of the challenged statements was improper and, even if this court were to determine otherwise, the defendant failed to establish that he was denied a fair trial.

Although the defendant did not object to the prosecutor's closing argument, we will review his claims of prosecutorial impropriety. "It is well established law . . . that a defendant who fails to preserve claims of prosecutorial [impropriety] need not seek to prevail under the specific requirements of [*State* v. *Golding*,

supra, 213 Conn. 239–40], and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test." (Internal quotation marks omitted.) *State* v. *Franklin*, 175 Conn. App. 22, 48, 166 A.3d 24, cert. denied, 327 Conn. 961, 172 A.3d 801 (2017).

"In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry."[18] (Internal quotation marks omitted.) *State* v. *Campbell*, 328 Conn. 444, 541–42, A.3d (2018); see also *State* v. *Elmer G.*, 176 Conn. App. 343, 363–64, 170 A.3d 749, cert. granted on other grounds, 327 Conn. 971, 173 A.3d 952 (2017). "[W]hen a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show . . . that the remarks were improper . . . ." (Internal quotation marks omitted.) *State* v. *Maguire*, 310 Conn. 535, 552, 78 A.3d 828 (2013).

"[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the jury, [however] [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based [on] the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . .

"Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. . . . While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment [on], or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider." (Internal quotation marks omitted.) Id., 553–54; *State* v. *Thomas*, 177 Conn. App. 369, 406, 173 A.3d 430, cert. denied, 327 Conn. 985, 175 A.3d 43 (2017). Guided by these legal principles, we

consider each instance of prosecutorial impropriety alleged by the defendant.

A

The defendant first claims that the prosecutor "argued facts not in evidence by urging the jury to find where [the defendant] was at particular times based on the cell phone evidence" and "invited sheer speculation unconnected to evidence." (Internal quotation marks omitted.) We reject the defendant's claim because the prosecutor's arguments were supported by the evidence.

We begin by setting forth the prosecutor's closing and rebuttal arguments, emphasizing those parts the defendant challenges. In his closing argument, the prosecutor stated in relevant part: "[T]*he strongest piece of evidence is the phone.* . . . [T]he phone records that came from it gave us a treasure trove of information. . . . Now, *you have a virtual map as to what happened.* . . . We have a start time, and you can see *at 3:06 in the afternoon on July 13, the person holding this phone leaves the area of 7 Cherry Street.* Again, information is that the defendant lives at 7 Cherry Street. . . . And *he travels up toward Albany Avenue. There's a quick stop,* as you can see. And *by about 3:25* [*p.m.*], *he's moving from that area.* You heard evidence that right within that area is Lenox Street. You have clear evidence that . . . [Christian] lives on Lenox Street. [*The defendant*] *picks* [*Christian*] *up.* . . .

"At [3:54 p.m.] a 911 [call is made] to the police . . . recording that a shooting happened. *The defendant and his phone are on top of the shooting scene at the upper portion of Flatbush Avenue.* . . . *And then there is flight, leaving from the area of Flatbush Avenue and going up towards 1154 Albany Avenue.* . . . [*T*]*he defendant's phone stays as is, connected to that area for quite some time.* And we all know why, ladies and gentlemen, because it took time to conduct the transaction with the pawn shop, selling the medallion and necklace. In fact, [McLean] tells us that [Christian] came into the pawn shop, worked out a deal, ultimately found out what [McLean] would offer him, and [Christian] said, I'll be right back. This is where we all use our logical common sense and understand that [Christian] went outside to see if that deal was all right. . . . He went outside to ask [the defendant] if that amount was all right. *Because after that period of time, the defendant, with his phone, moves about the city of Hartford.*

"Finally, *at about* . . . [*5:24 p.m.*] . . . [*the defendant*] *stops in the area of 438 Hillside Avenue,* not a coincidence that [Colon] says that he stopped with [Christian] and asked her to cash that check. And then she went with them, and attempts were made to cash it. And notice . . . *there is a return to that area, ultimately dropping off* [*Christian*]. [It is] my argument

that that evidence support[s] that . . . [Christian] is dropped off, *because the person holding this phone at the end of the evening on July 13, ultimately will come to stay on Cherry Street,* the defendant's address." (Emphasis added.) Thereafter, in rebuttal argument, the prosecutor stated that "*this phone and its records loop around the crime scene and every point of interest related to the* [*investigation*]." (Emphasis added.)

With the prosecutor's arguments in mind, we set forth the guiding law. It is well established that "[a] prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he . . . may not invite sheer speculation unconnected to evidence." *State* v. *Singh*, 259 Conn. 693, 718, 793 A.2d 226 (2002). "A prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. . . . [A] lawyer shall not . . . [a]ssert his personal knowledge of the facts in issue, except when testifying as a witness. . . . Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument." (Internal quotation marks omitted.) Id., 717.

The defendant contends that the prosecutor argued facts not in evidence by "urging the jury to find where [the defendant] was at particular times based on the cell phone evidence." We disagree. The prosecutor did not propose an unreasonable or unfair inference by arguing that the defendant's phone "loop[s] around . . . every point of interest . . . ." As we previously summarized in footnote 6 of this opinion, on the basis of the coverage maps and Weaver's testimony regarding the location of the defendant's cell phone, the jury reasonably could have inferred that the defendant was in different areas of Hartford at particular times on the day of the crime. To the extent that the defendant claims that the remark, "[t]he defendant and his phone are on top of the shooting scene," was improper, we also disagree. The jury heard testimony from two witnesses, both of whom made out-of-court and in-court identifications of the defendant. See footnotes 4, 7 and 8 of this opinion. We therefore conclude that the prosecutor's arguments did not unfairly present the cell phone evidence and simply invited the jury to draw reasonable inferences therefrom.

B

We next address the defendant's claim that the prosecutor improperly injected his own credibility into the case when he remarked, "I'm not the one that passed the fake ID that said I live at 7 Cherry Street." The defendant claims that this remark was improper because it "drew a comparison between [the prosecutor's] credibility and [the defendant's] allegedly deceptive conduct." We disagree with the defendant.

It is well established that "[a] prosecutor may not

express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . [*I*]*t is not improper* [*however*] *for the prosecutor to comment upon the evidence presented at trial* and to argue the inferences that the jurors might draw therefrom . . . . We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand." (Emphasis added; internal quotation marks omitted.) *State* v. *Perkins*, 271 Conn. 218, 268, 856 A.2d 917 (2004); see also *State* v. *Ivan G. S.*, 154 Conn. App. 246, 255–56, 105 A.3d 905 (2014), cert. denied, 315 Conn. 923, 108 A.3d 1123 (2015).

"Although prosecutors generally should try to avoid using phrases that begin with the pronoun I, such as I think or I believe, we recognize that the use of the word I is part of our everyday parlance and . . . because of established speech patterns, it cannot always easily be eliminated completely from extemporaneous elocution. . . . Furthermore, [t]he state's attorney should not be put in the rhetorical [straitjacket] of always using the passive voice, or continually emphasizing that he is simply saying I submit to you that this is what the evidence shows." (Citations omitted; internal quotation marks omitted.) *State* v. *Luster*, 279 Conn. 414, 436, 902 A.2d 636 (2006).

With these legal principles in mind, we turn to the defendant's claim that the prosecutor improperly placed his own credibility at issue during trial. We disagree. During his closing argument, the prosecutor reminded the jury that, although the cell phone was prepaid and did not indicate the name of the subscriber, the evidence presented at trial supported the inference that the defendant owned the cell phone and possessed it on the day of the crime. Specifically, the prosecutor stated: "[W]hen a person calls on July 14, 2013, to change the phone number of this phone, he uses the name Patrick. You'll recall that [Montanez] stopped [the defendant], and [the defendant] said his name was Aaron Patrick. And he gave [Montanez] a fake ID that says he was Aaron Patrick of 7 Cherry Street in Hartford. . . . [A]t 3:06 in the afternoon on July [13, 2013], the person holding this phone leaves the area of 7 Cherry Street [and returns at around 7 p.m.]. Again [the] information is that the defendant lives at 7 Cherry Street."

Thereafter, during rebuttal argument and in response to defense counsel's argument that the state had not proven that the cell phone was owned or possessed by the defendant, the prosecutor made the following

remarks: "We don't have a phone that says this belongs to [the defendant] the way it used to be in little kids' clothing. No. But when you consider all of the facts and circumstances, *I'm not the one that passed the fake ID that said I live at 7 Cherry Street*. And that was not the only piece of evidence. [DeMatteo] said that . . . his in-house [records] check . . . has [the defendant] living at 7 Cherry Street . . . ." (Emphasis added.) We conclude that the prosecutor did not improperly vouch for his own credibility because he was arguing from the evidence presented at trial. See *State* v. *Luster*, supra, 279 Conn. 436 ("if it is clear that the prosecutor is arguing from the evidence presented at trial, instead of giving improper unsworn testimony with the suggestion of secret knowledge, his . . . occasional use of the first person does not constitute [impropriety]"); see *State* v. *Gibson*, 302 Conn. 653, 655, 31 A.3d 346 (2011) ("prosecutor's two uses of the words I think while marshaling the evidence during closing argument . . . . [was] not improper" [internal quotation marks omitted]).

C

We next address the defendant's claim that the prosecutor improperly posed the following question to the jury: "Why does the defendant do a series of things that only point to his guilt and not point to his innocence?" The defendant contends that the prosecutor's argument improperly shifted the burden of proof by suggesting to the jury that the burden was on the defendant to prove his innocence. In response, the state argues that the prosecutor's "comment expressly referred to the defendant's guilty conduct after the crime was committed." We agree with the state.

"A comment that the defendant was without a reasonable explanation or had no reasonable explanation to show why he was innocent is not necessarily a comment that the jury would naturally and necessarily interpret as related to the defendant's constitutional and statutory right to decline to testify. A prosecutor also may comment on the failure of a defendant to support his factual theories." *State* v. *Smalls*, 78 Conn. App. 535, 543, 827 A.2d 784, cert. denied, 266 Conn. 931, 837 A.2d 806 (2003); see also *State* v. *Joseph R. B.*, 173 Conn. App. 518, 531–34, 164 A.3d 718 (prosecutor's closing argument not improper where comments based on evidence and did not draw attention to defendant's failure to testify), cert. denied, 326 Conn. 923, 169 A.3d 234 (2017); *State* v. *Colon*, 70 Conn. App. 707, 713, 799 A.2d 317 (prosecutor's argument regarding lack of explanation for defendant's flight from crime scene not improper), cert. denied, 261 Conn. 933, 806 A.2d 1067 (2002).

The record in the present case indicates that the prosecutor during his closing argument did not comment on the defendant's failure to testify at trial or on

the burden of proof. Instead, immediately following the statement at issue, the prosecutor referenced three actions taken by the defendant following the crime. Specifically, the prosecutor stated that the defendant: (1) knew the importance of the phone records and, therefore, changed his phone number the day after the crime; (2) evaded police custody on August 6, 2013; and (3) gave an alias and presented fake identification when approached by police on August 25, 2013. Therefore, because the prosecutor's argument was based on the evidence presented at trial and referred to the defendant's actions from which the jury could infer consciousness of guilt, we conclude that his comment was not improper. See *State* v. *Joseph R. B.*, supra, 173 Conn. App. 537 ("prosecutor's [closing argument not improper because it was] based on the evidence presented and refer[red] to a lack of explanation in the evidence, other than guilt, for a range of behavior"); *State* v. *Colon*, supra, 70 Conn. App. 713 ("prosecutor's remarks during . . . closing argument were merely an attack on the defendant's theory of defense and not improper comment regarding the defendant's failure to testify").

### D

The defendant's final claim of impropriety concerns the prosecutor's use of sarcasm during his rebuttal argument. Specifically, the prosecutor remarked that "maybe [the defendant] was out on the corner selling lemonade, and he had a little placard that said, I also have the ability to cash checks, all within an hour and a half." The defendant claims this sarcastic remark improperly "encouraged the jurors to view with disdain, rather than reasoned and moral judgment, the reasonable inference, consistent with [the defendant's] innocence, that he responded to [Christian's] request for help in cashing the check without having been involved in the shooting or any robbery." We disagree.

"It is well settled that [a] prosecutor may not seek to sway the jury by unfair appeals to emotion and prejudice . . . . [O]ur Supreme Court has recognized that repetitive and excessive use of sarcasm is one method of improperly swaying the fact finder. . . . Additionally, we have recognized that the excessive use of sarcasm may improperly influence a jury. . . . A prosecutor's frequent and gratuitous use of sarcasm can [call on] the jurors' feelings of disdain, and likely sen[d] them the message that the use of sarcasm, rather than reasoned and moral judgment, as a method of argument [is] permissible and appropriate for them to use. . . . Although we neither encourage nor condone the use of sarcasm, we also recognize that not every use of rhetorical language or device is improper. . . . The occasional use of rhetorical devices is simply fair argument." (Citations omitted; internal quotation marks omitted.) *State* v. *Holley*, 144 Conn. App. 558, 569, 72 A.3d 1279, cert. denied, 310 Conn. 946, 80 A.3d 907

(2013); see also *State* v. *Grant*, 154 Conn. App. 293, 321, 112 A.3d 175 (2014) ("[s]ome use of sarcastic and informal language, when intended to forcefully criticize a defense theory on the permissible bases of the evidence and the common sense of the jury, is not necessarily improper" [internal quotation marks omitted]), cert. denied, 315 Conn. 928, 109 A.3d 923 (2015).

Applying those principles to the present case, we conclude that the prosecutor's one sarcastic remark during his rebuttal argument was not improper. See *State* v. *Marrero-Alejandro*, supra, 159 Conn. App. 388–89 (prosecutor's sarcastic comments in response to defendant's closing argument not improper); *State* v. *John M.*, 87 Conn. App. 301, 314–15, 865 A.2d 450 (2005) (prosecutor's use of sarcasm twice in rebuttal argument not improper), aff'd, 285 Conn. 822, 942 A.2d 323 (2008). The record indicates that this remark was made in response to defense counsel's closing argument, in which he argued that evidence that the defendant helped Christian cash the check did not prove that the defendant committed the robbery. Accordingly, we conclude that this isolated remark was not improper.

## IV

We next address the defendant's claim that the trial court's second supplemental instruction misled the jury by "omitt[ing] and misdescrib[ing]" the essential elements of first degree robbery. The defendant's arguments in support of this claim are threefold. Specifically, the defendant argues that the court's second supplemental instruction: (1) "repudiated the original instruction by stating that the state did not have to prove the defendant committed the elements of robbery" (emphasis omitted); (2) erroneously charged the jury that the defendant could be found guilty as an "active participant" when "[t]he state charged [the defendant] as a principal and did not request an instruction on accessorial liability"; and (3) "suggest[ed] that there were two participants [which] intruded on the jury's function" to decide issues of fact.

The defendant concedes that this claim was not properly preserved at trial because defense counsel failed to object to the second supplemental charge and now seeks review of this claim pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40. In the present case, the record is adequate for our review because it contains the full transcript of the defendant's criminal proceedings.[19] Moreover, "[a]n improper instruction on an element of an offense . . . is of constitutional dimension." (Internal quotation marks omitted.) *State* v. *DeJesus*, 260 Conn. 466, 472–73, 797 A.2d 1101 (2002). Although reviewable, the defendant's instructional claim fails under the third prong of *Golding* because it is not reasonably possible that the jury was misled by the court's second supplemental instruction.

The following procedural history is relevant to our resolution of this claim. On May 21, 2015, the trial court delivered its initial charge to the jury. The defendant concedes that the trial court's initial charge was correct because "it accurately informed the jury of the elements required to convict the defendant of [robbery in the first degree] as a principal . . . ." The jury began its deliberations that afternoon and, thereafter, sent the following note to the court: "On page [twenty-three] of the jury charge, does the sentence '[i]f any person who participated in the crime was armed with a deadly weapon while in immediate flight from the crime, then all participants in the robbery would be just as guilty of first degree robbery as if they themselves actually done so' refer only to element [three] or override all elements? That is, did the defendant himself need to use physical force (element [two]) if a gun was present? Or do all three elements need to be proven?"

In response to that note, the court charged the jury in relevant part: "And your question regarding page twenty-three of the jury charge . . . that portion that you talked about, that only applies to [the third element of robbery in the first degree]. Element three requires the possession of a weapon or a deadly instrument. . . . So, that needs to be proven beyond a reasonable doubt. And, obviously, all three elements need to be proved beyond a reasonable doubt for you to reach a, in your minds, a verdict of guilty. If . . . any of the elements are not proven, then you must return a verdict of not guilty." Defense counsel did not take exception to this supplemental instruction and, on appeal, the defendant concedes that the first supplemental instruction was correct.

The defendant's challenge, therefore, is limited to the trial court's second supplemental instruction, which was given in response to the following jury note: "For robbery in the [first degree] to be proven, does the defendant *himself* need to (1) commit larceny (physically deprive another of property) and (2) use or threaten physical force, or can another participant [commit] one and two, while he (the defendant) is in the proximity? I.e., if the robbery is a team effort, do both participants become equally guilty of robbery in the first [degree]?" (Emphasis in original.) The court noted that both the prosecutor and defense counsel had read the jury's note, and that a discussion took place in chambers. The following exchange subsequently occurred on the record:

"The Court: . . . I reviewed the statute, which specifically states that robbery in the first degree can be committed by the defendant, himself, or another participant. So, I'm going to instruct the jury that . . . the state does not have to prove beyond a reasonable doubt it was the defendant, himself, who actually took the object. That it could be any one of the two, and that's

sufficient. Is that your understanding of our discussion [in chambers]?

"[The Prosecutor]: It is. It is. I would just ask that the court augment it by also saying that you have to find that he was an active participant. My concern on that is based on—

"The Court: Right. The proximity.

"[The Prosecutor]: —note saying, proximity.

"The Court: I agree with you.

"[The Prosecutor]: And . . . the court may even want to say when you write something like proximity, refer them to the section of mere presence—

"The Court: Right.

"[The Prosecutor]: —as part of your instructions.

"The Court: [Defense Counsel]?

"[Defense Counsel]: Nothing to add. Thank you, Your Honor."[20]

The court then charged the jury as follows: "[T]he gist of [your question] is, does the state have to prove that the defendant, himself, committed the larceny and/or with the use of physical force or the threat of physical force. And the answer to that is, no. [B]ecause there was a participant, either of those two, if they committed the larceny, as well as the physical force or the threat of physical force, then you can find the defendant guilty, if you think there's enough evidence for that beyond a reasonable doubt to do so. But you also have to find that the defendant was an active participant . . . in the crime, not, [as] you wrote in here, in the proximity. That's not enough. . . . [T]he state has to prove that he actively participated in the . . . robbery itself."

With the entirety of the court's jury instructions in mind, we next set forth the legal principles that guide our analysis. "[I]ndividual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . In other words, we must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury." (Internal quotation marks omitted.) *State* v. *Revels*, supra, 313 Conn. 784.

On the basis of our review of the entire jury charge, we conclude that it is not reasonably possible that the jury was misled by the court's second supplemental instruction. See *State* v. *Delgado*, 247 Conn. 616, 627, 725 A.2d 306 (1999) (not reasonably possible that jury was misled where trial court did not contradict concededly correct initial and first supplemental charges in challenged second supplemental charge). In this case, the defendant concedes that the trial court properly charged the jury regarding the elements of robbery in the first degree in its original instruction and first supplemental instruction. With respect to the second supplemental charge, the court properly answered the specific question that was raised by the jury; see Practice Book § 42-27;[21] and did not contradict either of its previous instructions. See *State* v. *Delgado*, supra, 627. We conclude, therefore, that the defendant's claim fails under the third prong of *Golding* because he has failed to demonstrate that a constitutional violation exists and deprived him of a fair trial.[22]

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Additionally, the defendant claims that he was harmed by the cumulative impact of the improper admission of the cell tower evidence, the prosecutorial improprieties, and the instructional error because they "combined to permit the jury to convict [him] if [it] believed [he] was 'involved' in the crimes, but not that he actually committed the elements of robbery." We disagree.

The defendant, appearing to acknowledge that our Supreme Court has yet to adopt the cumulative error doctrine under state law; see *State* v. *Campbell*, 328 Conn. 444, A.3d (2018); argues that because the "claim asserts a violation of [his] federal due process right to a fair trial, [it] does not depend on acceptance of a state law cumulative error doctrine." "[F]ederal case law in which the cumulative unfairness doctrine . . . has required reversal of a conviction essentially seems to fall into one or more of the following categories: (1) the errors directly related to and impacted an identified right essential to a fair trial . . . (2) at least one of the errors was so significant as to render it highly doubtful that the defendant had received a fair trial and the remaining errors created the additional doubt necessary to establish that there was serious doubt about the fairness of the trial, which is necessary to reverse a conviction; or (3) the errors were pervasive throughout the trial." (Internal quotation marks omitted.) Id., 557; see also *Hinds* v. *Commissioner of Correction*, 321 Conn. 56, 95, 136 A.3d 596 (2016).

As we subsequently conclude in parts II and IV of this opinion, the court did not improperly admit the cell phone coverage maps into evidence or improperly instruct the jury with respect to robbery in the first degree. Moreover, as we conclude in part III of this opinion, the prosecutor's remarks during closing argument were not improper. We conclude, therefore, that, "even if we were to recognize the cumulative error doctrine as articulated in the federal courts . . . the [alleged] trial improprieties in the present case would not justify relief under that doctrine." (Internal quotation marks omitted.) *State* v. *Campbell*, supra, 328 Conn. 557; *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 95.

[2] Because we affirm the judgment of the trial court, we need not address the defendant's claim that his acquittal on the charge of murder precludes retrial for any offense that would require the state to prove his identity as the gunman who caused the victim's death.

[3] The victim's family members described the medallion as a Daffy Duck caricature holding two bags of money.

[4] Lara gave a sworn statement at the Hartford Police Department on August 15, 2013. Lara was shown an array of nine photographs and selected the third photograph, that of the defendant. Lara indicated that she was

"very confident" that it was the individual shown in photograph three who shot the victim.

DeJesus lived on the first floor of 10-12 Flatbush Avenue. DeJesus was inside and witnessed the shooting through a front window. DeJesus gave an oral statement on July 14, 2013, and a sworn statement at the Hartford Police Department on August 17, 2013. DeJesus was shown an array of nine photographs and selected the fifth photograph, that of the defendant, indicating that he was "pretty sure" that the individual in photograph five was the shooter.

[5] In *State* v. *Steele*, 176 Conn. App. 1, 169 A.3d 797, cert. denied, 327 Conn. 962, 172 A.3d 1261 (2017), this court summarized cellular network technology, how call detail records and cell site information are generated, and how that data can be analyzed: "Cell phones are essentially sophisticated two way radios that use cellular networks comprised of cell sites [often referred to as cell towers] and radio frequency (RF) antennae to communicate with one another. . . . A cell site is the fixed location that provides cellular coverage using RF antennae, a base station, and other network equipment. . . . The geographical coverage area of a cell site is called a cell sector. . . . The shape and size of a cell sector is variable and depends on several external and internal factors. . . . When an individual places a call or sends a message, the cell phone communicates with the base station at the cell site with which it has the strongest, best quality signal. . . . Importantly, the cell site in closest proximity to these cell phones might not be the one producing the strongest, best quality signal for them. . . . The characteristics of the cell site, the RF antenna, and the cell phone as well as a variety of environmental and geographic factors influence which cell site has the strongest, best quality signal for a cell phone. . . .

"Every time a cell phone sends or receives a communication the base station at the cell site automatically generates a call detail record. . . . The purpose of call detail records is to enable the cellular provider to bill a subscriber accurately for his or her cell phone usage and to help the carrier understand the calling patterns of their subscribers. . . . Call detail records can contain a variety of information depending on the cellular carrier, but these records ordinarily include some information about the cell site(s) used to make or receive the communication. . . . The call detail records in the present case contain information about the cell sites in use when the cell phone initiated and terminated a communication. [This analysis] uses the cell site and antenna information contained in a call detail record to determine which cell sector a cell phone was using at the time of a certain communication and, thereby, the geographical area the cell phone, and by inference its user, was in at that time. . . . [T]he approximate size and shape of a cell sector can be determined by drawing a pie-wedge diagram on a map. . . . The center angle of the pie-wedge corresponds to the antenna's beam width setting, e.g., 120 degrees, and the outward boundary of the pie-wedge will extend 50 to 70 percent of the way into the opposing cell sector. . . . Critically, the boundaries of an estimated cell sector are not fixed. Depending on a variety of factors, the actual cell sector can be smaller or larger than the estimated cell sector." (Citations omitted; footnotes omitted.) Id., 17–24.

[6] The video depicted an underlying map of the city of Hartford, overlaid by the coverage area of a specific cell site and sector, as well as the areas of interest to the police investigation, including 7 Cherry Street, 10-12 Flatbush Avenue, 1154 Albany Avenue, and Colon's residence, 438 Hillside Avenue. The time lapse video reveals the following: at approximately 3:04 p.m., the defendant's cell phone connected to a cell site sector covering 7 Cherry Street. At approximately 3:24 p.m., the defendant's cell phone connected to a cell site sector covering Christian's residence on Lenox Street. At approximately 3:51 p.m., the defendant's cell phone connected to a cell site sector with coverage area encroaching on, but not covering, 10-12 Flatbush Avenue. At approximately 4:17 p.m., the defendant's cell phone connected to a cell site sector covering K & M and, in the half hour thereafter, numerous phone calls were made within that same coverage area. At approximately 5:08 p.m., a call was made from the defendant's cell phone within a coverage area that included the Webster Bank branch on Park Street. Between approximately 5:39 p.m. and 6:27 p.m., the defendant's cell phone connected to various cell site sectors covering the north end of Hartford, including Lenox Street. Finally, at approximately 6:48 p.m., the defendant's cell phone connected to a cell site sector covering 7 Cherry Street.

[7] At trial, DeJesus identified the defendant as the person who shot the victim.

[8] Lara testified that she had given a statement to the police and selected the victim's shooter from a photographic array. See footnote 4 of this opinion. Lara explained that she had wanted to give that statement but did not want to testify. During cross-examination by defense counsel, Lara stated that she was "done talking"; thereafter, she was held in contempt of court. Lara subsequently purged herself of the order of contempt and defense counsel continued his cross-examination. When asked if she could identify the defendant as the person who shot the victim, Lara replied, "[y]es." When asked to reaffirm her identification, however, she stated, "I don't know."

[9] The jury found the defendant not guilty of murder.

[10] On March 20, 2017, our Supreme Court, pursuant to Practice Book § 65-1, transferred the defendant's appeal to this court.

[11] We address the defendant's sufficiency of the evidence claim before we address any other claims because if a defendant prevails on such a claim, the proper remedy is to direct a judgment of acquittal. See *State* v. *Ramos*, 178 Conn. App. 400, 404, 175 A.3d 1265 (2017), cert. denied, 327 Conn. 1003, 176 A.3d 1195 (2018).

[12] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

General Statutes § 53a-134 provides in relevant part: "(a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime: (1) Causes serious physical injury to any person who is not a participant in the crime; or (2) is armed with a deadly weapon; or (3) uses or threatens the use of a dangerous instrument; or (4) displays or threatens the use of what he represents by his words or conduct to be a . . . revolver . . . or other firearm . . . ."

[13] *State* v. *Edwards*, supra, 325 Conn. 97, retroactively applies to the present case because "a rule enunciated in a case presumptively applies retroactively to pending cases." (Internal quotation marks omitted.) *State* v. *Elias G.*, 302 Conn. 39, 45, 23 A.3d 718 (2011).

[14] "In [*State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998)], [our Supreme Court] followed the United States Supreme Court's decision in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and held that testimony based on scientific evidence should be subjected to a flexible test to determine the reliability of methods used to reach a particular conclusion. . . . A *Porter* analysis involves a two part inquiry that assesses the reliability and relevance of the witness' methods. . . . First, the party offering the expert testimony must show the expert's methods for reaching his conclusion are reliable. . . . Second, the proposed scientific testimony must be demonstrably relevant to the facts of the particular case in which it is offered, and not simply be valid in the abstract. . . . Put another way, the proponent of scientific evidence must establish that the specific scientific testimony at issue is, in fact, derived from and based [on] . . . [scientifically reliable] methodology." (Internal quotation marks omitted.) *State* v. *Edwards*, supra, 325 Conn. 124.

[15] "[P]lain error . . . is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . [It] is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly." (Internal quotation marks omitted.) *State* v. *Ampero*, 144 Conn. App. 706, 714, 72 A.3d 435, cert. denied, 310 Conn. 914, 76 A.3d 631 (2013). "A [defendant] cannot prevail under [the] plain error [doctrine] unless [he] has demonstrated that the failure to grant relief will result in manifest injustice." (Internal quotation marks omitted.) *State* v. *Vega*, 128 Conn. App. 20, 29 n.3, 17 A.3d 1060, cert. denied, 301 Conn. 919, 21 A.3d 463 (2011).

[16] Weaver testified in part: "I can't tell you that a person was in a certain area. I can't tell you a street address that they were on. Moreso, what I can tell you is, where they weren't. So, if you make a phone call right now . . . your phone is [going to] go through a coverage area that covers this courthouse. It's not [going to] show you were in Hamden, Connecticut. . . . Your [call is going to] show where you were. So, I can determine not only where the call was routed through, but more . . . likely where you weren't when

that call was routed.

\* \* \*

"[T]he movement is actually just shown of where the cell phone goes over time. So, [it moves] from the center of one coverage area to the center of the next coverage area. I can't tell you which streets were driven down. The . . . only thing we can be 100 percent sure of is, the phone calls were made and that at some point the cell phone traveled . . . from one coverage area to the next coverage area."

We also highlight the following exchange between the prosecutor and Weaver:

"[The Prosecutor]: Now, let me ask you . . . do you see [Colon's residence]?

"[The Witness]: Yes.

"[The Prosecutor]: Do you see that it's outside of the [coverage area] that you've drawn?

"[The Witness]: It is.

"[The Prosecutor]: Based on your training, experience, understanding of the range of cell [sites], cell phone companies and the information they report to you, would the phone necessarily have to be in the orange or brown area?

"[The Witness]: No.

"[The Prosecutor]: And explain why not?

"[The Witness]: Well, the [cell sites] . . . are put into . . . place and [the cell phone companies] . . . regulate the power output of the antenna. They don't want it to go too far, because they don't want to . . . interfere with other [cell sites]. [I]f you have [too much] interference from . . . these overlapping [cell sites] . . . you get dropped calls. So, what you'll see is primarily we like to use the [one and one-half] mile analogy here in Hartford, because that is kind of where we're at. That does not mean that if you're a little bit farther out that you won't still connect with that tower. There might be a better line of sight, or you might have a building in the way and that tower is the best tower as opposed to the one that might be closer . . . .

"[The Prosecutor]: Does this go back to what you previously said, that it's a . . . range . . . or an area? And . . . while it potentially can say where someone may have been, it more definitively can say where someone wasn't?

"[The Witness]: Yes.

"[The Prosecutor]: Or where someone's phone wasn't.

"[The Witness]: Exactly, sir."

[17] Additionally, the defendant asks us to review this claim under this court's supervisory authority; we, however, decline to do so. Our Supreme Court has explained that, "bypass doctrines permitting the review of unpreserved claims such as [*Golding*] . . . and plain error . . . are generally adequate to protect the rights of the defendant and the integrity of the judicial system . . . . [T]he supervisory authority of this state's appellate courts is not intended to serve as a bypass to the bypass, permitting the review of unpreserved claims of case specific error—constitutional or not— that are not otherwise amenable to relief under *Golding* or the plain error doctrine. . . . Consistent with this general principle, we will reverse a [judgment] under our supervisory powers only in the rare case that fairness and justice demand it. [T]he exercise of our supervisory powers is an extraordinary remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of [the] utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Citations omitted; internal quotation marks omitted.) *State* v. *Reyes*, 325 Conn. 815, 822–23, 160 A.3d 323 (2017). The defendant's case presents no such circumstances.

[18] As we conclude subsequently, the prosecutor's remarks during his closing and rebuttal arguments were not improper. We, therefore, need not determine whether any improper conduct by the state's attorney violated the defendant's right to a fair trial under the factors set forth in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987).

[19] The state argues that this claim fails to satisfy *Golding*'s first prong "because the record is devoid of any instruction nullifying the concededly correct original charge . . . ." The state, relying on *State* v. *Dyson*, 238 Conn. 784, 793, 680 A.2d 1306 (1996) ("review of the record fail[ed] to reveal a jury instruction that expressly sanctioned a nonunanimous verdict"), argues that because "the defendant is alleging that the trial court stated something that affirmatively eliminated the jury's need to consider elements

it must find in order to convict after it had given the correct instruction . . . the record should reflect that the trial court actually did something so drastic." We do not find support for the state's proposition in *Dyson*. A thorough reading of our Supreme Court's opinion in that case indicates that the defendant's claim was not analyzed pursuant to *Golding*. See *State* v. *Dyson*, supra, 791–94. Moreover, the fact that "the record does not support [a defendant's] claim," as the state argues, does not mean that the record is inadequate and, therefore, undeserving of *Golding* review. See, e.g., *State* v. *Montanez*, 277 Conn. 735, 743–44, 894 A.2d 928 (2006).

[20] The state contends that the defendant's instructional claim was waived because "the trial court reviewed [the second supplemental instruction] with the state and defense counsel in chambers and both indicated that it was an appropriate response to the jury's question." Because we conclude that it is not reasonably possible that the jury was misled by the court's second supplemental instruction, we need not address the state's waiver argument. See *State* v. *Tarasiuk*, 125 Conn. App. 544, 547 n.5, 8 A.3d 550 (2010) ("The state argues that this claim was waived because the defendant approved of the instructions at trial. Because we find that the charge as stated was proper, we decline to address the issue of waiver.").

[21] Practice Book § 42-27 provides: "If the jury, after retiring for deliberations, requests additional instructions, the judicial authority, after providing notice to the parties and an opportunity for suggestions by counsel, shall recall the jury to the courtroom and give additional instructions to respond properly to the request or to direct the jury's attention to a portion of the original instructions."

[22] Alternatively, the defendant seeks review of this claim pursuant to the plain error doctrine; see Practice Book § 60-5; or under this court's supervisory authority over the administration of justice. Because the trial court correctly instructed the jury with respect to robbery in the first degree, there is no manifest injustice that warrants reversal pursuant to the plain error doctrine. See *State* v. *Jaynes*, 36 Conn. App. 417, 430, 650 A.2d 1261 (1994), cert. denied, 233 Conn. 908, 658 A.2d 980 (1995). Additionally, we decline to exercise our supervisory powers to review the defendant's claim of instructional error. See footnote 17 of this opinion.

———————————————